**216**

CALIFORNIA LEGISLATIVE COUNCIL FOR OLDER AMERICANS, an unincorporated voluntary association, et al., Plaintiffs,

v.

Caspar W. WEINBERGER, Individually and in his capacity as Secretary of the United States Department of Health, Education and Welfare, et al., Defendants.

Civ. No. S74–32.

United States District Court, E. D. California.

April 5, 1974.

Robert M. Teets, Jr., Peter E. Sitkin Food Advocates, Berkeley Cal., Ralph Santiago Abascal, San Francisco Neighborhood Legal Assistance Foundation, Peter D. Coppelman, Philip Neumark, Cal. Rural Legal Assistance Senior Citizens Project of the National Senior Citizens Law Center, San Francisco, Cal., for plaintiffs.

Evelle J. Younger, Atty. Gen. of Cal., for California defendants.

John J. Klee, Jr., San Francisco, Cal., N. Eugene Hill, Dwayne Keyes, U. S. Atty., Brewster Q. Morgan, Sacramento, Cal., for Federal defendants.

## MEMORANDUM OF OPINION AND JUDGMENT

RENFREW,[*] District Judge.

Plaintiffs,[1] four unincorporated associations,[2] representing elderly, disabled and blind citizens, an officer of each association,[3] and an individual, Philip E. Draper, who is disabled and has received food stamps under the federal Food Stamp Program, 7 U.S.C. §§ 2011–2026, challenge a determination

---

[*] Judge Renfrew was assigned to the Eastern District of California on March 8, 1974, by order of the Ninth Circuit Court of Appeals.

1. Plaintiffs initially sought to prosecute this lawsuit as a class action under Rule 23, Federal Rules of Civil Procedure, but they subsequently decided to proceed on their behalf and not as a class action "in reliance upon uniform and statewide compliance by the federal and state defendants with any orders of the Court." Plaintiffs' Reply Memorandum to Defendants' Opposition, filed February 22, 1974, pp. 1–2.

2. California Legislative Council for Older Americans, Disabled and Blind Action Committee of California, National Association for the Advancement of the Disabled and Blind, and East Bay Legislative Council of Senior Citizen Groups.

3. There is some confusion in the amended complaint as to the inclusion of these four officers as plaintiffs. They are not included in the caption of that complaint or in its preliminary statement, but they are listed as plaintiffs in paragraphs 3 through 6. Since their inclusion would in no way prejudice defendants, the plaintiffs in this lawsuit will include the Reverend Edward Peet, Edward Roberts, Hale Zukas, and Charles G. Drasnin, officers, respectively, of the associations listed in footnote 2, *supra*.

made by one defendant,[4] Secretary of Health, Education and Welfare (HEW) Weinberger (hereinafter "Secretary"), under P.L. 93–233, § 8, which in effect suspended the Food Stamp Program in California for the elderly, disabled, and blind as of January 30, 1974, and until at least July 1, 1974. In place of food stamps, the eligible recipients are now receiving payments under a federally administered program through which both federal and state welfare funds are channeled. Plaintiffs seek to invoke the jurisdiction of this Court[5] under 28 U.S.C. §§ 1337 and 1361 and under 5 U.S.C. § 701 et seq.

Plaintiffs attack both the manner in which the Secretary made his decision and the decision itself, contending that it was arbitrary and capricious. They ask for a preliminary injunction postponing the effect of the decision pending review of it by this Court, for an order holding unlawful and setting aside the decision and remanding the matter to the Secretary for redetermination, and for a declaratory judgment that the Secretary's determination violated P.L. 93–233, § 8, and 5 U.S.C. § 706(2)(A) and (C).

Hearings were held on the motion for a preliminary injunction on March 11 and 12, 1974. At the close of those hearings, all parties agreed that the trial on the merits should be consolidated with the hearings on the preliminary injunction under Rule 65(a)(2), Federal Rules of Civil Procedure. The Court so ordered, and the matter was submitted.

## I. *Jurisdiction*

■ Since this case involves the federal Food Stamp Program, which is an act of Congress regulating commerce,[6] this Court has jurisdiction under 28 U.S.C. § 1337. Lidie v. State of California, 478 F.2d 552, 554 (9 Cir. 1973); Moreno v. United States Department of Agriculture, 345 F.Supp. 310, 313 (D.D.C.1972), aff'd, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

■ The federal defendants, however, contend that, under the doctrine of Larson v. Domestic & Foreign Corp.,[7] 337 U.S. 682, 689–690, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), this lawsuit was actually brought against the United States without its consent and therefore must be dismissed as to them. The Court disagrees. One exception to the rule of sovereign immunity arises when the federal officer's action is *ultra vires*:

> "* * * where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be made the object of specific relief. It is important to note that in such cases the relief

---

4. The other named defendants are Secretary of Agriculture Butz, David B. Swoap, Director of the California Department of Social Welfare, and Wilson Riles, Superintendent of Public Instruction and Director of Education for the State of California.

5. This action was originally filed on January 28, 1974, in the United States District Court for the District of Columbia. It was transferred to this Court by an order entered after a motion for transfer under 28 U.S.C. § 1404 had been filed by all the parties.

6. The Congressional declaration of policy behind the Food Stamp Program is in pertinent part as follows:

> "The Congress further finds that increased utilization of food in establishing and

maintaining adequate national levels of nutrition will promote the distribution in a beneficial manner of our agricultural abundances and will strengthen our agricultural economy, as well as result in more orderly marketing and distribution of food. To alleviate such hunger and malnutrition, a food stamp program is herein authorized which will permit low-income households to purchase a nutritionally adequate diet through normal channels of trade." 7 U.S.C. § 2011.

7. *See also* City of Fresno v. California, 372 U.S. 627, 629, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963); Dugan v. Rank, 372 U.S. 609, 621–623, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Malone v. Bowdoin, 369 U.S. 643, 646–648, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962).

can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient." *Larson, supra,* 337 U.S. 682, at 689–690, 69 S.Ct. 1457, at 1461, 93 L.Ed. 1628.

Plaintiffs' theory is, essentially, that the Secretary misinterpreted the statute authorizing him to take certain action, P. L. 93–233, § 8(c), and that as a result the action that he took was beyond the authority given him by Congress.[8] Therefore, plaintiffs' claim does fall within the *ultra vires* exception to the *Larson* rule of sovereign immunity. *See* State of Washington v. Udall, 417 F.2d 1310, 1316–1317 (9 Cir. 1969); Association of N.W. Steel., etc. v. United States Army Corps of Eng., 485 F.2d 67, 69 (9 Cir. 1973). *Cf.* Scholder v. United States, 428 F.2d 1123, 1127 (9 Cir. 1970), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970).

■ Even if an action falls within an exception to the bar of sovereign immunity, it may still fail if the relief sought would "require affirmative action by the sovereign or the disposition of unquestionably sovereign property." *Larson, supra,* 337 U.S. 682, at 691, n. 11, 69 S. Ct. 1457, at 1462, 93 L.Ed. 1628. The relief requested by plaintiffs does not raise problems of this sort. *See* Rockbridge v. Lincoln, 449 F.2d 567, 573 (9 Cir. 1971); State of Washington v. Udall, *supra,* 417 F.2d 1310, 1318–1319 (9 Cir. 1969).

■ Plaintiffs' action is also not barred by 5 U.S.C. § 701(a)(1) or (2). *See* Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L. Ed.2d 681 (1967); State of Washington v. Udall, *supra,* 417 F.2d 1310, 1319–1320 (9 Cir. 1969).

## II. *The Relevant Federal Legislation*

An understanding of the general outlines of the legislation that forms the background of this lawsuit is necessary in order to comprehend fully the precise issues and specific provisions that it involves. Although written in a style and form dear only to the hearts of Congressional draftsmen, the major policies and principles enacted in these recent statutes are relatively clear.

On October 30, 1973, Congress passed P.L. 92–603, often referred to by its House number, H.R. 1. By these statutory provisions, Congress repealed and replaced, as of January 1, 1974, the system of federal grants-in-aid to state-administered welfare programs.[9] Under this new system, the federal government would make payments [10] from its own funds to eligible [11] aged, blind, and disabled individuals. States could elect to make supplemental payments and could enter into an agreement with the Secretary to have federal administration of the payments, thus saving the states the costs of administration. P.L. 92–603, § 301 (§ 1616 of the Social Security Act as amended); 42 U.S.C. § 1382e. Another substantial benefit to the states was made available at their option. If a state made supplementary payments to the eligible recipients which, when added to the federal payments, were at least at the same level as the payments it made to eligible recipients in January, 1972, the state's payment would be no more than its expenditures in aid of such recipients for the calendar year 1972. The federal government, in effect, would assume the burden of increased expendi-

---

8. See pp. 225–230, *infra.*

9. For the basic provisions of the supplanted system, see 42 U.S.C. §§ 301 (aged persons), 1201 (blind persons), and 1351 (disabled persons) (1970).

10. The maximum federal grant to an individual was initially $130 per month and for an individual with an eligible spouse $195 per month. P.L. 92–603, § 301, amending Title XVI, § 1611(b), of the Social Security Act. These figures were changed by P.L. 93–66, § 210, to $140 and $210 effective July 1, 1974, and then made effective January 1, 1974, and changed to $146 and $219 effective July 1, 1974, by P.L. 93–233, § 4.

11. For eligibility requirements, see P.L. 92–603, § 301; 42 U.S.C. § 1382.

tures at the January, 1972, level of benefits that arose from an increased caseload. This provision, P.L. 92–603, § 401, has been termed the "hold harmless" section in that the states falling within its terms would be held harmless for welfare costs caused solely by the rising number of persons eligible for payments. If the state's supplementary payments exceeded the January, 1972, level, however, the state would have to assume that portion of the payment in excess of the January, 1972, level for all eligible recipients.

P.L. 92–603, § 401(b)(1), also gave the states the option to increase their supplemental payments by the "bonus value" of food stamps.[12] As of January, 1972, without liability for the increased welfare costs. This allowance was clearly an offset to the direct impact which P.L. 92–603 had on the Food Stamp Program. By § 411(a),[13] persons eligible for the new federal supplementary security income benefits provided for by P.L. 92–603, § 301, were to be ineligible for food stamps as of January 1, 1974. Recipients would be direct-ly compensated for the loss of food stamps if the states elected to increase their supplemental payments, at federal expense, by an amount equal to the bonus value of food stamps.

The foregoing provisions of P.L. 92–603 have been amended by P.L. 93–86 (August 10, 1973) and P.L. 93–233 (December 31, 1973). P.L. 93–86, § 3(b),[14] modified P.L. 92–603, § 411(a), *supra*, which had precluded food stamps for those eligible for the new federal benefits. Under this amendment, food stamps would still be available for a person who received less in federal and state payments under the new system than he would have received under the prior state welfare plan in December, 1973, *plus* the bonus value of food stamps (determined by the Food Stamp Schedule effective July, 1973). Eligibility for food stamps, therefore, was to be determined upon an individual basis. See also P.L. 93–86, § 4(c).

Recognizing that certain difficulties were apparent in this individualized eligibility for food stamps,[15] Congress en-

---

12. "[T]he term 'bonus value of food stamps in a State for January 1972' (with respect to an individual) means—
    "(A) the face value of the coupon allotment which would have been provided to such an individual under the Food Stamp Act of 1964 for January 1972, reduced by
    "(B) the charge which such an individual would have paid for such coupon allotment.
    " * * *." P.L. 92–603, § 401(b)(3).

13. "Effective January 1, 1974, section 3(e) of the Food Stamp Act of 1964 [7 U.S.C. § 2012(e)] is amended by adding at the end thereof the following new sentence: 'No person who is eligible (or upon application would be eligible) to receive supplemental security income benefits under title XVI of such Act shall be considered to be a member of a household or an elderly person for purposes of this Act.' "

14. "Section 3(e) of the Food Stamp Act of 1964 is amended by striking out the last sentence therein and inserting in lieu thereof the following sentence: 'No individual who receives supplemental security income benefits under title XVI of the Social Security Act shall be considered to be a member of a household or an elderly person for any purpose of this Act for any month if such person receives for such month, as part of his supplemental security income benefits or payments described in section 1616(a) of the Social Security Act (if any), an amount equal to the bonus value of food stamps (according to the Food Stamp Schedule effective for July 1973) in addition to the amount of assistance such individual would be entitled to receive for such month under the provisions of the plan of the State approved under title I, X, XIV, or XVI, as appropriate, in effect for December 1973, assuming such plan were in effect for such month and such individual were aged, blind, or disabled, as the case may be, under the provisions of such State plan or under Public Law 92–603 as amended. * * *.' " See 7 U.S.C. § 2012(e).

15. In its announcement of the reporting of H.R. 3153, the bill enacted as P.L. 93–233, the Senate Finance Committee observed:
    "Under present law many Supplemental Security Income (SSI) recipients will be eligible for food stamps; however, an aged, blind or disabled individual will be ineligible for food stamps for a given month if

acted new amendments in P.L. 93–233. The individualized system of determining food-stamp eligibility provided for by P.L. 93–86, § 3(b), was made effective July 1, 1974, rather than January 1, 1974. P.L. 93–233, § 8(a)(2). For the six-month interim period, persons receiving the new federal benefits would be eligible for food stamps unless they resided in a state "which provides State supplementary payments (A) of the type described in section 1616(a) of the Social Security Act, [as provided by P.L. 92–603, § 301] and (B) the level of which has been found by the Secretary of Health, Education and Welfare to have been specifically increased so as to include the bonus value of food stamps." P.L. 93–233, § 8(a)(1) (amending 7 U.S.C. § 2012(e)). The Secretary could make this finding:

"(1) only if, prior to October 1, 1973, the State has entered into an agreement with the Secretary or taken other positive steps which demonstrate its intention to provide supplementary payments under section 1616(a) at a level which is at least equal to the maximum level which can be determined under section 401(b)(1) of [P.L. 92–603] and which is such that the limitation on State fiscal liability under section 401 does result in a reduction in the amount which would otherwise be payable to the Secretary by the State, and (2) only with respect

to such months as the State may, at its option, elect." P.L. 93–233, § 8(c).

P.L. 93–233, § 8, requires the Secretary to make, in effect, two findings: (1) that in fact the state's payments were increased specifically to include the bonus value of food stamps,[16] and (2) that the state had the requisite intention prior to October 1, 1973, to raise its payments to a level invoking the "hold-harmless" provision, P.L. 92–603, § 401, as demonstrated by an agreement with the Secretary or by other positive steps.

It is the Secretary's finding that the State of California fell within P.L. 93–233, § 8, that plaintiffs have challenged.

III. *Factual Background*

Prior to October 1, 1973, the State of California did not enter into an agreement with the Secretary implementing P.L. 92–603, §§ 301 and 401, for California. Four bills were introduced in the State Legislature during the 1973 session which were designed to conform the State welfare system to the requirements of P.L. 92–603, but none passed. After the 1973 legislative session had closed, the Secretary of the State Health and Welfare Agency and defendant Swoap, Director of the State Department of Social Welfare, expressed their intention to take steps toward entering into an agreement with the Secretary providing for federal administration of State welfare payments under P.L. 92–

his SSI benefits plus any State supplementary payment are at least equal to the welfare payment plus the bonus value of food stamps he would be eligible to receive if the State's December, 1973 State plan were still in effect. This provision of law enacted this year will be extremely difficult to administer and would present problems of unequal treatment in food stamp eligibility for SSI beneficiaries."

16. In a statement filed in these proceedings, the Secretary has stated this first requirement as follows: "California must be in a position to benefit from the 'hold harmless' provisions of section 401 of P.L. 92–603." This is not the Court's interpretation of § 8. That section requires only that the state's payments be specifically increased to cover the bonus value of food stamps, not to level

required by P.L. 92–603, § 401. While there would be no economic incentive to a state to increase its payments so as to include the bonus value of food stamps were the total payment to be below the January, 1972, level, nevertheless such a possibility exists. Viewed in a somewhat different light, a state which specifically increased its payments above the January, 1972, level to include the bonus value of food stamps but which had a declining population of recipients would not be in a position to benefit from the "hold harmless" provisions, as the Secretary seems to require. But this difference in interpretation has no bearing on the merits of this action. California's payments are at a level consistent with § 401 and were specifically increased to cover the bonus value of food stamps. See footnote 18, *infra.*

603. On November 19, 1973, the State Court of Appeal for the Third District ruled that those two State officials did not have the authority under existing legislation to implement P.L. 92–603 in California by agreement with the Secretary. California League of Senior Citizens, Inc. v. Brian, 35 Cal.App.3d 443, 456, 110 Cal.Rptr. 809, 817–818 (1973). On December 5, 1973, at a special session, the State Legislature passed and the Acting Governor signed the necessary legislation. California Welfare and Institutions Code § 12000 et seq. The legislature authorized a State agreement with the Secretary under which the State's supplementary payments would at least equal the level of benefits extant in January, 1972, plus the bonus value of food stamps.[17] An agreement was entered into by the State and federal government on the same day. The bonus value of food stamps to be included in the State's adjusted payment level was an average $10.00 per person per month.[18]

. On January 16, 1974, Frank C. Carlucci, Under Secretary of HEW, sent telegrams to the governors of six states, including California, which stated in pertinent part the following:

"It has been determined that the provisions of Section 8(c) of P.L. 93–233 apply to your state. Therefore, your state has the option to:

"1. Retain the bonus value of food stamps in your adjusted payment level with the result that SSI/state supplementation recipients in your state may not participate in food programs[;]

"2. Remove the bonus value of food stamps from your adjusted payment level with the result that SSI and/or state supplementation recipients are not precluded from food program participation."

On January 17, 1974, defendant Swoap wired HEW that the State chose to retain the bonus value of food stamps in its adjusted payment levels.

On January 30, 1974, the Department of Agriculture promulgated regulations, published in the Federal Register, which implemented the Secretary's findings. 7 C.F.R. § 271.10. As of that date, recipients of the new federal and state benefits in California were ineligible for food stamps.

The Secretary has supplied a statement, dated February 15, 1974, setting forth the reasons for his determination that California fell within P.L. 93–233, § 8, and the record that was before him when he decided that the State had taken the "positive steps" required by that statute.[19]

## IV. *Lack of Explicit Findings or Reasons*

■ The first ground upon which plaintiffs attack the Secretary's finding that California fell within § 8 of P.L. 93–233 is that he made a wholly conclusionary determination and did not set forth the factual findings and legal criteria that formed the basis of his decision. They ask for the matter to be re-

---

17. "The department shall enter into an agreement with the secretary providing for administration by the secretary of the provisions of this chapter. The agreement shall provide at least the following:

   *     *     *     *     *

"(g) That the state exercises its option to increase the payment level under Section 401(b)(1) of Title IV of the Social Security Act Amendments of 1972 by an amount equal to the sum of (A) and (B) of Section 401(b)(1) of that title." Cal.Welfare and Institutions Code § 12100.

18. The following are the six basic adjusted payment levels, including the $10.00 per person "cash-out" of the bonus value of food stamps, as set forth in the agreement:

| | AGED | BLIND | DISABLED |
| --- | --- | --- | --- |
| Individuals | $216.61 | $236.54 | $212.68 |
| Couples | $392.58 | $431.90 | $372.68 |

Under the legislation passed on December 5, 1973, the eligible recipients receive benefits (federal plus State supplementary payments) in excess of these adjusted payment levels. See Cal.Welfare and Institutions Code § 12200.

19. See footnote 27, *infra.*

manded to the Secretary for a "redetermination with a clear enunciation of the decisional criteria, reasoning and facts."

The Secretary has filed a statement in this action which both explains his decision and provides a record of those materials which he considered in reaching it. He concludes his statement with these words: "Upon intensive reexamination I reaffirm my previous finding." It would appear that no good would now be served by a remand even if the Court found that the Secretary's decision of January 16, 1974, should have been accompanied by a statement of reasoning and factual findings. "To remand now would be an idle and useless formality." NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766, n. 6, 89 S.Ct. 1426, 1430, 22 L. Ed.2d 709 (1969) (plurality opinion of Fortas, J.). *See also* Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 417, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Court finds, however, that such a statement was not required at the time of the decision.

■ Nowhere in § 8 of P.L. 93–233 did Congress mandate a statement of reasons or factual findings by the Secretary. Although this Congressional silence is, of course, not dispositive of plaintiffs' claim, it is significant. Since Congress also did not order hearings on the question of whether states fell within the terms of § 8, a statement of findings, conclusions and reasons is not necessary under 5 U.S.C. § 557(a), (c).

The decision by Congress not to require hearings comports with the purpose and setting of this legislation. P. L. 93–233, § 8, provided for an interim system of food-stamp eligibility; this provisional system was to last at most six months unless Congress acted again to delay the starting date of P.L. 93–86, § 3(b), the provision requiring individualized determination of eligibility for food stamps. Since P.L. 93–233 was enacted on December 31, 1973, to be effective the next day, January 1, 1974,

prompt action on the part of the Secretary was necessary if the interim legislation was to have something resembling its full intended effect. The Secretary, of course, had to interpret the terms of § 8 and review the relevant facts in each case to determine which states fell within the section. But the contemporaneous publication of his interpretation and his factual findings would in this context not have contributed anything of value.

Although plaintiffs' argument that a system of "principled decision-making" demanded a formal statement by the Secretary is not wholly platitudinous, it does constitute an over-generalization which ignores the public interest in avoiding bureaucratic delay and expense. They rely for authority upon cases dealing with administrative situations very different from the one under review in this action. For instance, in Environmental Defense Fund, Inc. v. Ruckelhaus, 142 U.S.App.D.C. 74, 439 F.2d 584, 596 (1971), the court held that the Secretary of Agriculture "has an obligation to articulate the criteria that he develops in making each individual decision", but that decision was in the setting of a statute requiring a determination of whether "imminent hazard to the public" necessitated certain administrative action. The Secretary of Agriculture was thus required to make a difficult factual judgment within a considerable scope of discretion. Similarly, the court in Citizens Ass'n of Georgetown, Inc. v. Zoning Com'n of D.C., 155 U.S. App.D.C. 233, 477 F.2d 402, 408 (1973), stated that "when faced with a complex problem [land-use controls], having widespread ramifications * * * a court should surely have the benefit of the agency's expertise." Four Supreme Court decisions cited by plaintiffs involved quasi-judicial actions by agencies in complex matters of law and fact. Each case involved a highly significant issue of first impression.[20]

20. FTC v. Sperry & Hutchinson Co., 405 U. S. 233, 248–249, 92 S.Ct. 898, 31 L.Ed.2d

170 (1972) (unfair competitive practices); Investment Co. Institute v. Camp, 401 U.S.

This case is hardly analogous to plaintiffs' authorities. Here the Secretary had to determine two factual issues: (1) had the State in fact specifically raised its supplementary payments so as to incorporate the bonus value of food stamps, and (2) had the State entered into an agreement with HEW or taken other positive steps prior to October 1, 1973, demonstrating an intention to implement § 401 of P.L. 92–603. His determination that the State fell within § 8 of P. L. 93–233 logically entailed that the Secretary had made positive findings on both questions. Since no agreement with HEW had been entered into by the State and no legislation implementing § 401 had been enacted prior to October 1, 1973, it was also evident that the Secretary had construed "other positive steps" to include other, less final State actions. Plaintiffs could have had little doubt that the Secretary had construed § 8(c) in a manner not consistent with their interpretation. Therefore, the Secretary's decision of January 16, 1974, was not inherently in need of explicit rationalization in order to be understood.

The Supreme Court's decision in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), is, despite plaintiffs' urging that it supports their position, a telling authority contrary to their argument. In *Overton Park,* petitioners challenged the action of the Secretary of Transportation in authorizing the spending of federal funds for the construction of an interstate highway through a public park in Memphis on the grounds *inter alia* that he failed to make formal findings. The relevant statutes prohibited the spending of such funds if a "feasible and prudent" alternative route existed. If no alternative were available, approval of the highway construction could be given only if there had been "all possible planning to minimize harm" to the park. The Court held that no formal findings on these factors were required: "[A]lthough formal findings may be required in some cases in the absence of statutory directives when the nature of the agency action is ambiguous, those situations are rare. [citations omitted] Plainly, there is no ambiguity here * * *." 401 U.S. 402, at 417, 91 S.Ct. 814, at 824, 28 L.Ed.2d 136. Certainly there was greater room for discretionary judgment, if not greater "ambiguity," in the statutory criteria facing the Secretary of Transportation in *Overton Park* than in those facing the Secretary of HEW here. And here the Secretary has produced an explanation and full administrative record, as required by *Overton Park,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136. *See also* Camp v. Pitts, 411 U.S. 138, 142–143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

The Secretary did not, at the time of his decision, publish the record (or a summary of it) upon which he relied. Nor, apparently, did he indicate that such a record existed and was available for inspection. Since the Secretary's explanation and production of the administrative record occurred during this litigation, it must be "viewed critically." Citizens to Preserve Overton Park v. Volpe, *supra,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Material presented publicly after a decision has been made carries with it the unavoidable possibility, however slight, that it has been assembled selectively, and perhaps subconsciously, in an effort at self-justification. In this case, the possibility is a very slim one. The statement and record are much more complete than the *"post hoc rationaliza-*

---

617, 624–628, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (operation of mutual investment fund by national banks and 12 U.S.C. §§ 24, 378(a)); SEC v. Chenery Corp., 332 U.S. 194, 196–197, 67 S.Ct. 1575, 1577–1578 (1947), and SEC v. Chenery Corp., 318 U.S. 80, 89–90, 63 S.Ct. 454, 87 L.Ed. 626 (1943)

(fiduciary duties of officers and directors of public utility holding company during reorganization of company).

Indeed, in each of these cases except *Investment Co. Institute, supra,* the agency had prepared an opinion, the adequacy of which was the concern of the Court.

tions" that were before the Supreme Court in *Overton Park.* 401 U.S. 402, at 419, 91 S.Ct. 814, 28 L.Ed.2d 136. The Secretary's explanation removes any reasonable doubt that factors outside the bare record played a part in his decision. *Cf. Overton Park, supra,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136. Moreover, the Secretary, in a commendable effort, acted within seventeen days of the enactment of P.L. 93–233. His explanation and the administrative record were filed thirty-five days after the decision. To insist upon contemporaneous explanation and production of the administrative record in every context of administrative decision-making would be to encourage bureaucratic delay in situations, as here, in which the public interest as expressed by Congress demands prompt action.

If the Secretary were required to make formal, written findings or issue an opinion setting forth his interpretation of P.L. 93–233, § 8, administrators would have to take such action in virtually all cases in which a statute or regulation calls for some judgment on their part, however minimal, and however obvious the administrators' findings and reasons appear from the fact of the decision. Such a rule of law would be quixotic in its quest for further bureaucratic formality since it would in effect ignore interests of speed and economy. As Professor Davis has written of adjudications by regulatory agencies:

"For adjudications of substantial magnitude, like most adjudications of the federal regulatory agencies, the desirability of systematically publishing reasoned opinions is clear. Their preparation affords a safeguard against arbitrary or careless action, and the resulting body of precedents makes for consistency and predictability. Disadvantages relate to time and expense of preparation, expense to practitioners of maintaining accessible bodies of reports, and, perhaps, the hard fact of finite shelf space in law libraries. Some administrative publications of decisions become so numerous and bulky as to become unwieldy * * *. The problem from this angle is of course a wholly practical one; much can be said for a practice of both courts and commissions of publishing opinions only in those cases which seem to have special value as precedents." 2 Davis, Administrative Law Treatise, § 16.13, at 487–488 (1958) (footnote omitted).

In this case, in a decision relating to an interim legislative provision in which the exercise of the Secretary's judgment was narrowly prescribed, and the possibility of a substantial challenge in court remote, the Secretary was not required to make formal, written findings or issue an opinion at the time of his decision.

V. *The Merits of the Secretary's Decision*

A. *"Other Positive Steps"*

■ Plaintiffs' primary challenge to the Secretary's decision is that he misinterpreted what was required by the term in § 8(c) of P.L. 93–233, "other positive steps which demonstrate [the State's] intention" to provide supplementary payments consistent with § 401, the "hold-harmless" section of P.L. 92–603. Plaintiffs' contention is that "other positive steps" must mean *final* action which in fact provides supplementary payments at least at a level required by § 401. In different states, such final action could be executive action under existing enabling legislation or (as in California) only by new legislation. Although plaintiffs have mounted some imaginative arguments for this interpretation, none is persuasive.

On a linguistic level, the fact that Congress indicated that an agreement with HEW *or* other positive steps demonstrating the appropriate intention were sufficient does not mean that both parts of the disjunction must share similar characteristics, such as finality. If Congress had intended that such a meaning be given its statutory terms, it

could simply have used the phrase, for instance, "legislation or other final action raising the state supplementary payments to a level consistent with § 401 of P.L. 92–603." *Cf.* New York Dept. of Social Services v. Dublino, 413 U.S. 405, 414, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973). That is not to say that Congress always adopts the shortest linguistic route to its semantic objective. Congress often voices "its wishes in muted strains", leaving it "to the courts to discern the theme in the cacophony of political understanding." Rosado v. Wyman, 397 U.S. 397, 412, 90 S.Ct. 1207, 1218, 25 L.Ed.2d 442 (1970). But a court's "chief resources" in interpreting "muted" language "are the words of the statute and those common-sense assumptions that must be made in determining direction without a compass." 397 U.S. 397, at 412, 90 S.Ct. 1207, at 1218, 25 L.Ed.2d 442. The only "common-sense" interpretation possible of the language in question is that it does not mean only *final* state action. The only reasonable construction is that the Secretary was to consider what action each state had taken prior to October 1, 1973, and decide whether it demonstrated the requisite intention at that time. If final action were required, the reference to intention would be superfluous; the fact would be plain.[21]

Plaintiffs point to language in the hoary opinion in Penhallow v. Doane's Administrators, 3 U.S. (3 Dall.) 53, 93–94, 1 L.Ed. 507 (1795), for the proposition that the steps taken by the State required by § 8(c) mean that action by the State legislature was necessary prior to October 1, 1973. But the language in fact conflicts with the conclusion which plaintiffs try to draw from it. Justice Iredell observed:

"[W]hen any law is passed, in any state, in pursuance of constitutional authority, it is a law of the whole state, acting in its legislative capacity; as are, also, executive and judiciary acts, constitutionally authorized, acts of the whole state, in its executive or judiciary capacity, and not the personal acts alone of the individuals composing those branches of government." 3 U.S. 53, at 93.

Plaintiffs have failed to provide the Court with authorities indicating that the executive acts which the Secretary found did demonstrate the requisite intention were not properly "authorized." Their reference to Article 3, § 3[22] of the California Constitution is not on point. While that section prohibits one branch of state government from exercising the power of another branch, it does not say that each branch exercising its own power does not act for the State. Nor does it define the scope of authority for each branch.

Plaintiffs rely heavily upon the state court decision in California League of Senior Citizens, Inc. v. Brian, 35 Cal. App.3d 443, 456, 110 Cal.Rptr. 809, 817–818 (1973), that State executive officers did not, in attempting to implement P.L. 92–603 in California, "[have] authority to yield administration of the state adult aid programs to the federal government." The court also ruled "that the [State] Controller lacks authority to pay to HEW state funds \* \* \* for administration in the program." The court did not hold, as plaintiffs suggest, that the State executive officers had no authority to negotiate with HEW or take other steps preparing for implementation of P.L. 92–603 in California. The court's decision of November 19, 1973, has little relevance to the proper interpretation of § 8(c).[23]

---

21. Indeed, if final action were the intended meaning, Congress, sitting in late December, 1973, could have determined for itself and provided explicitly in the statute which particular states were to be included.

22. "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

23. Plaintiffs have insisted "that the Court must consider the effect of the decision" in the state-court case, citing Thorpe v. Housing Authority of City of Durham, 393 U.S.

Its sole import was that, as of that date, it was clear that further legislation would be needed to implement the new welfare system in the State.

In an age in which extensive, technical legislation and fiscal considerations abound in the welfare field, it would be anomalous for a court, especially a federal court, to rule that state executive officers, generally the only governmental personnel with the time and expertise to approach a mastery of the field, must await enabling legislation before they are authorized to take any acts whatsoever to prepare their state for a new system.

Plaintiffs' final argument, one of Congressional intent, is derived solely from analysis of the terms of § 8(c) and not from legislative history. They suggest that Congress established the October 1, 1973, date to insure that welfare recipients had had ninety days within which to adjust their consumption habits before the new welfare system began on January 1, 1974. If a state had increased its supplemental payments before October 1 to cover the bonus value of food stamps, then the recipients would have known that they probably would not be entitled to food stamps as of January 1, 1974. If the state had not taken such final action, then the recipients would know that they would still be entitled to food stamps as of January 1, 1974.

Plaintiffs' contention has a fatal flaw. P.L. 93-233 could not have had an impact on anyone's budgetary planning prior to its enactment. As of October 1, 1973, a California recipient, assuming knowledge of the then existing legislation, would have known the amount of his state payments, the level of federal supplemental security income payments to be made as of January 1, 1974, and that under P.L. 93-86, § 3(b), he would not be deprived of food stamps after January 1, 1974, were his total payments below the payments he would have been entitled to receive under the state welfare plan in effect in December, 1973, plus the bonus value of food stamps.[24] Next, assuming the unlikely fact that a California recipient would have been aware on or after October 30, 1973, of the proposed P.L. 93-233, which on that date was favorably reported by the Senate Finance Committee, it is questionable whether the possibility of enactment of such legislation would be a rational basis for budgetary planning. Further, at the time that the bill was reported, the Senate Finance Committee announced that recipients would continue to receive food stamps through July 1, 1975 (reduced in P.L. 93-233 to July 1, 1974), unless their state had specifically increased the level of supplementary payments to include the bonus value of food stamps. Since California did not increase its payments until December 5, 1973, a California recipient would have justifiably believed until that date that he would have been entitled to receive food stamps as of January 1, 1974. After December 5, 1973, a recipient knew what the California payments would be and that the bonus value of food stamps was included in them. Finally, when P.L. 93-233 was enacted, it took effect the next day, thus giving little, if any, "lead time" to any California

268, 281-283, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), and Ziffrin, Inc. v. United States, 318 U.S. 73, 63 S.Ct. 465, 87 L.Ed. 621 (1943). But, clearly, the Secretary could not have included it in his administrative record of State acts prior to October 1, 1973, even if it had been probative evidence of a lack of the requisite intention. In fact, prior to October 1, the State Attorney-General's Office had given a tentative, informal opinion that State executive officers could implement P.L. 92-603 in the State although it had come to the opposite conclusion in an earlier opinion. These opinions may have been "somewhat inconclusive advice", California League of Senior Citizens, Inc. v. Brian, 35 Cal.App.3d 443, 448, 110 Cal.Rptr. 809, 812 (1973), but they were the basis of evidence which the Secretary properly considered. See footnote 27, *infra*. It seemed at least possible that before October 1, 1973, the State executive officers could have implemented the new program themselves.

24. See footnote 14, *supra*.

recipient who might be adversely affected by it. The October 1, 1973, deadline, having been adopted retroactively, could not have been intended by Congress to ensure that recipients had had notice or "lead time" to plan their budgets.

The Court discerns three elements of the Congressional intent behind P.L. 93–233, § 8. First, it wanted to avoid, in effect, double federal payment of food-stamp benefits. It recognized that certain states had acted to increase their supplemental payments to cover the bonus value of food stamps.[25] If those states had also raised their supplemental payment levels consistently with § 401, the "hold-harmless" section of P.L. 92–603, then the federal government would be in fact assuming the cost of paying the bonus value of food stamps. As to those payments to recipients eligible for food stamps, the federal government would be paying twice for the food-stamp benefits. Second, even if a state were not entitled to be held harmless, if it had specifically raised its payments to cover the bonus value of food stamps, then persons also eligible for food stamps would be getting twice the designed benefit. The federal government, by denying food stamps to those recipients, would thus be saving federal funds. Third, the federal government clearly intended to withhold the "hold-harmless" benefits from those states that had not acted expeditiously to implement the new welfare system in a manner consistent with § 401. Thus, even if states had in fact raised their benefits with the intention of covering the bonus value of food stamps through § 401, a failure to have demonstrated the requisite intention prior to October 1, 1973, would deprive them of hold-harmless treatment for the bonus value of food stamps for at least six months. The October 1 date was probably selected to permit only states which had taken action before the introduction of interim legislation (e. g., P.L. 93–233) to receive the "hold-harmless" benefits. The implicit message to states which did not obtain hold-harmless treatment by the Secretary's failure to find the appropriate intention was that prompt action in the future might avoid similar Congressional denials of benefits.[26] Congress therefore was considering the situations and needs of welfare recipients when it enacted § 8, but not in the manner plaintiffs have suggested.

These Congressional intentions support an interpretation of § 8(c) which would read "other positive steps" as meaning good-faith efforts by state officials prior to October 1, 1973, which would establish the intention and the substantial likelihood that § 401 would be implemented by the state in the near future.

B. *The Secretary's Finding*

The next question is whether, under the Court's construction of § 8(c), the Secretary's finding that the State had taken positive steps demonstrating the requisite intention prior to October 1, 1973, was a proper finding. The standard of review is whether that finding was "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. [citations

---

25. "Because of the short time left before the SSI program becomes effective, however, the amendment includes a provision under which those States which have already made plans to 'cash out' food stamps by providing higher benefits to offset the loss of food stamps would be permitted to do so, with recipients in those States ineligible for food stamps." Summary of Proposed Amendments to H.R. 11333, 119 Cong.Rec.No. 202, p. S23790, at p. S23791 (December 21, 1973).

26. "Congress sometimes legislates by innuendo, making declarations of policy and indicating a preference while requiring measures that though falling short of legislating its goals, serve as a nudge in the preferred directions." Rosado v. Wyman, 397 U.S. 397, 413, 90 S.Ct. 1207, 1218, 25 L.Ed.2d 442 (1970).

omitted] Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S. Ct. 814, 823, 28 L.Ed.2d 136 (1971).

With his statement, the Secretary has included those documents constituting the administrative record upon which he relied in making his decision.[27] Several

27. "In explaining and affirming that determination we have again examined and again considered the following documents which demonstrate that California, prior to October 1, 1973, took positive steps which demonstrated its intention to provide supplemental payments at a level at least equal to the adjusted payment level, including cash-out.

"1. As early as November 7, 1972, immediately following the enactment of P.L. 92–603, a study on the Impact of H.R. 1 on California was written by W. Michael Mahoney of the Office of Research and Statistics of the Social Security Administration, Department of Health, Education, and Welfare (exhibit 2). That study showed that California had at that time enacted a $12.00 adult assistance benefit increase and that the increase raised California's benefit level above their January 1, 1972 level (which is the level used in computing the adjusted payment level.)

"2. Also in November 1972 the California Health and Welfare Agency published a booklet titled "Impact of H.R. 1 in California" (exhibit 3). On page 7 of that booklet it was stated that the impact study was premised on California supplementing 'federal payments [SSI] up to State maximums in effect in January 1974.' Benefit levels of $221 for aged persons, $233 for blind persons and $206 for disabled persons were listed as including the bonus value of food stamps. Thus, California expressed its intention immediately to cash-out food stamps and to continue high levels of State supplementation under SSI.

"3. On April 30, 1973, Dr. Earl W. Brian, Secretary of California's Health and Welfare Agency wrote me a letter (exhibit 4) wherein he indicated his State's desire to maintain payment levels in the form of State supplementation in effect at that time which were at least equal to what was later determined to be the adjusted payment level including the food stamp bonus value.

"4. On July 12, 1973, David B. Swoap, Director of the California Department of Social Welfare, in a letter signed by the Chief Deputy Director, Ronald M. Kurtz (exhibit 5), indicated to Mr. Ken Wade of Governor Reagan's Washington D.C. office, that California wished to retain the food stamp cash-out and opposed pending legislation (passed in amended form as P.L. 93–

86) which would have, had it passed in its existing form, removed cash-out provisions.

"5. On July 13, 1973, Mr. Newlin, Deputy Director for Payment Operations for the California Department of Social Services, wrote to David Swoap (exhibit 6), indicating his view concerning the adverse consequence to recipients in California of pending legislation to. eliminate the food stamp cash-out (see item 4). Mr. Swoap, on July 13, 1973 (exhibit 7), forwarded his objections via telegram to the entire California delegation of the United States House of Representatives.

"6. A letter from Arthur E. Hess, Acting Commissioner of Social Security, to David Swoap, dated July 27, 1973 (exhibit 8), was written to confirm a conversation between the parties. This letter reaffirmed California's intent to have Federal administration of its supplementation.

"7. On August 1, 1973, Mr. David Swoap wrote Mr. John F. Richardson, Regional Commissioner of the Social Security Administration (exhibit 9) and informed him that he had computed California's adjusted payment level at $216.61. This figure included the $10.00 food stamp cash-out (item 13).

"8. On September 18, 1973, Governor Ronald Reagan wrote me in reference to recent amendments to Supplemental Security Income (P.L. 93–66, not directly involving food stamps) (exhibit 10). Governor Reagan stated unequivocally that he wished to ensure that no recipient received a reduction in his total adult assistance benefits under Supplemental Security Income.

"9. On September 21, 1973, the determination was made that, based on opinions by the California attorney general, California had authority to enter into a contract with the Social Security Administration concerning Federal administration of California's optional supplement of Supplemental Security Income benefits (exhibit 11).

"10. The State of California, on or before September 23, 1973, forwarded its proposed payment schedule to the Social Security Administration (exhibit 12). In all instances California indicated its intention to provide optional supplementation of benefits to the extent that all recipients would be receiving amounts in excess of the adjusted payment level which included the bonus value of food stamps."

of these documents involve expressions of intent to implement P.L. 92–603 in California made by State executive officers to federal officials. One letter, from the Governor of California to the Secretary, is clearly based upon the belief that the State would adopt a level of supplementary payments that would ensure that California would be entitled to be held harmless under § 401. The Governor describes certain proposals by the State administration as being designed "to ensure that no recipient receives a reduction in benefits." Given that commitment by the highest executive officer of the State, and in light of the other expressions of intent and actions of State officers which were before the Secretary, this Court finds that he did consider the relevant factors [28] and that he did not make a clear error in judging that the State had taken positive steps prior to October 1, 1973 demonstrating the intention required by § 8(c).

The benefit levels adopted by the State Legislature are above the adjusted payment levels, including bonus value of food stamps, for California.[29] Indeed, the Legislature indicated in the legislation that the bonus value of food stamps was to be included and that the payment levels adopted were designed to gain "hold-harmless" effect under § 401.[30]

Therefore, the Secretary's finding that the State met the conditions established by § 8 of P.L. 93–233 was not "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law."

## CONCLUSION

The primary legal questions posed by this action were eminently technical ones: jurisdiction, the necessity of making formal administrative findings, whether the Secretary's finding was "arbitrary or capricious." Behind these questions, however, were very real, human interests. On the one hand, a successful challenge to the Secretary's finding could mean that the State would have to absorb approximately $36.3 million in welfare costs lost from federal "hold-harmless" protection [31] or take the politically controversial (and perhaps improbable) move of cutting welfare benefits. Thus, a greater fiscal burden would be placed upon the State's taxpayers or welfare recipients would suffer a decline in benefits.

On the other hand, certain aged, blind, and disabled welfare recipients in Cali-

---

The Secretary's summary of these documents is accurate.

In considering the administrative record, the Court has viewed it critically. See p. 224, *supra.*

**28.** Plaintiffs, significantly, have not suggested that there were other relevant factors, not considered by the Secretary, which would have tended to demonstrate the absence of the required intention. While not relevant to the review of the Secretary's finding, plaintiffs' counsel conceded at oral argument that the only difference between the administration and the opposition in the Legislature was how much above the adjusted payment level the State supplemental payments were to be. Indeed, each of the four bills which failed in the Legislature contemplated payments in varying amounts above the adjusted payment level.

Plaintiffs argue that the administrative record establishes only "that various members of California's executive branch of government, at various points in time prior to October 1, 1973, offered various expressions of their willingness to include the bonus value of food stamps in the adjusted payment level." They contend that the documents considered by the Secretary were, in effect, irrelevant to the question of whether the *State* had taken the requisite "positive steps." They rely again upon their "body politic" arguments (see pp. 226–227, *supra*) and the decision in California League of Senior Citizens, Inc. v. Brian, 35 Cal.App. 3d 443, 110 Cal.Rptr. 809 (1973) (see pp. 226–227, *supra*).

**29.** See footnote 18, *supra.*

**30.** See pp. 221–222, *supra.*

**31.** If the Secretary were compelled to find that the State had not specifically increased its supplementary payments to cover the bonus value of food stamps, then, presumably, the State could not be held harmless in terms of an optional increase in its adjusted payment level which included the bonus value of food stamps under P.L. 92–603, § 401(b)(1)(B).

fornia (the parties differ on the number) have experienced an actual decline in benefits received as a result of the conversion from the old system to the new federally administered system.[32] Under the Food Stamp Program, individuals whose rent and utility costs constituted an extremely high percentage of their monthly income received a higher bonus value of food stamps than the average.[33] With the use of the flat $10 bonus value in calculating the State's supplementary payments, some of these persons are receiving less in payments per month now than in December, 1973, when food stamps were available to them.

However compelling and important these fiscal and welfare considerations are for society, they cannot be allowed to influence judicial review of decisions by administrative officers under Congressional statutes. Courts must play a narrow role in this nation's welfare system, and, as a corollary, the public must rely upon the informed judgment of its executive officials and legislators. As the Supreme Court said in Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970):

> "We do not decide today that the [state law] is wise, that it best fulfills the relevant social and economic objectives that [the State] might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare

assistance programs are not the business of this Court. * * * [T]he Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients."

*See also* New York Dept. of Social Services v. Dublino, 413 U.S. 405, 413, 93 S. Ct. 2507, 37 L.Ed.2d 688 (1973); Jefferson v. Hackney, 406 U.S. 535, 546–547, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); Rosado v. Wyman, 397 U.S. 397, 419, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

That stress on the public's reliance upon their executive and legislative officials in the shaping and management of welfare systems is well placed is evidenced by developments after the submission of the issues in this lawsuit. Counsel for the parties and representatives from the State and federal agencies involved met informally in chambers with the Court on three occasions in an effort to seek a reconciliation of the real problems the recipients faced with loss of food stamps. As a result of these efforts and in an impressive demonstration of concern and from a sense of responsibility for the recipients in question, counsel for the State defendants advised the Court at the last conference that the State agencies will propose legislation substantially in the form attached as Appendix A to this opinion. Under this legislation the Court is informed that more that 90% of the California recipients disadvantaged by the change to the new welfare system as the result of the loss of food stamps would not suffer any decrease in the level of benefits received.[34] Counsel for the fed-

---

32. Plaintiffs have claimed that 138,000 recipients potentially fall into this category. See their amended complaint, ¶ 30, and the affidavits of Verne C. Gleason, Special Advisor on Welfare and Human Relations to the California State Senate. Defendants' view is that 7,326 recipients are affected in this manner. See the affidavit of William H. Montgomery, Chief of the Federal Program Management Branch of the State Depart-

ment of Benefit Payments. While plaintiffs' statistics may have some significant miscalculations, it is not necessary to this opinion that the Court find the actual number of recipients affected.

33. See the affidavit of William H. Montgomery.

34. While all expressed a concern that not every affected recipient might be covered by

eral defendants advised the Court at the same time that the federal government would cooperate in the implementation and management of the proposed legislation. Defendants, it should be noted, informed the Court that any such proposal should be considered independent of this action and not viewed as a settlement or compromise of the issues. While the Court finds that the proposed legislation does not have any bearing on the legal merits of the issues submitted to it, the proposal does truly reflect the concerted efforts of counsel and defendants to understand and meet the needs of the recipients involved. As set forth in this opinion, there has been sharp disagreement as to the legal issues involved but, as shown in the post-submission action, unanimity in the concern for and desire to protect the California recipients. It is a great pleasure for the Court to work with counsel and parties who share such interests and a commitment to work for their resolution.

Since the hearing on plaintiffs' application for a preliminary injunction was consolidated with a hearing on the merits of their claims. The Court's decision will be a final decision on the merits. There are no factual controversies on any material issues. Defendants are entitled to judgment as a matter of law.

It is hereby ordered, adjudged and decreed that plaintiffs' motion for a preliminary injunction is denied.

It is hereby ordered, adjudged and decreed that judgment be entered in favor of defendants.

It is hereby further ordered, adjudged and decreed that the parties are to bear their respective costs.

the proposed legislation, counsel for defendants demonstrated convincingly that the costs of insuring that all possibly affected recipients would receive any proposed relief would be many times the total amount of benefits received by all disadvantaged recipi-

## APPENDIX A

SEC. 1 (a) The Director of Benefit Payments is authorized and directed to enter into an agreement with the Secretary of Health, Education and Welfare which shall provide that the mandatory minimum state supplementation payment referred to in Section 212(a)(3)(A) of Public Law 93–66 and in Section 12204 of the Welfare and Institutions Code shall be increased for the individuals referred to in subdivision (b) by the amount described in subdivision (c) for the period described in subdivision (d).

(b) The individuals referred to in subdivision (a) of this section are those who (1) were recipients of food stamps, and of aid payments under former Chapters 3, 4, or 6 of Part 3 of Division 9 of the Welfare and Institutions Code, for the month of December 1973, (2) were recipients of aid payments for the months of January 1974 and June 1974 under Chapter 3 of Part 3 of Division 9 of said code (as amended by Chapter 1216, Statutes of 1973), (3) realized in January 1974 grant increases of $—— or less, which increases were less than their shares of the bonus value of food stamps purchased by or for them during December 1973, and (4) who shall apply for the increase referred to in subdivision (a) within fifteen days after the date of mailing of a notice which shall be sent to them by the Department of Benefit Payments prior to July 1, 1974, using a form prescribed by the Department and supplied with such notice.

(c) For the purposes of this act, the term "bonus value of food stamps" means the difference between the face value of the food stamps purchased during December 1973 and the amount of cash payment made therefor, if any.

ents. In light of such a cost-benefit ratio, the defendants were faced with two viable alternatives: (1) a program which would cover the vast majority of recipients, or (2) no program at all.

An individual's share of the bonus value of food stamps shall be determined by dividing such difference by the number of persons in the individual's food stamp household during December 1973 for whom food stamps were purchased during said month. The increase referred to in subdivision (a) shall be an amount which will result in a grant increase equal to the amount by which an individual's share of the bonus value of food stamps for December 1973 exceeded the grant increase realized by him in January 1974.

(d) The period referred to in subdivision (a) shall begin in January 1974 and continue so long as the ineligibility for food stamps of recipients of Supplemental Security Income established by the amendment of Section 3(e) of the Food Stamp Act of 1964 by Public Law 93–233, and extended by any subsequent amendment to Section 3(e), shall be in effect.

SEC. 2. The sum of $—— is hereby appropriated from the General Fund to the Department of Benefit Payments for disbursement to the Secretary of Health, Education and Welfare for assistance payments made, and for administrative costs incurred and not otherwise assumed by the Secretary under the contract with the Department of Benefit Payments or as permitted by federal law.

SEC. 3. If any provision of this act shall be held to be unconstitutional or to be in conflict with federal law, it is the intention of the Legislature that the entire act shall be void.

SEC. 4. This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution and shall go into immediate effect. The facts constituting such necessity are:

In order to implement the payment program provided by this act by a date sufficiently early to meet the needs of the persons benefited by the act, it is necessary that this act take immediate effect.