Dorothy McINNIS et al.,
Plaintiffs,

v.

Caspar W. WEINBERGER, Individually
and in his capacity as Secretary, United
States Department of Health, Educa-
tion and Welfare, et al., Defendants.

Civ. A. No. 74–1481–T.

United States District Court,
D. Massachusetts.

Jan. 10, 1975.

Valerie Vanaman, Harvard Legal Aid Bureau, Cambridge, Mass., Charles Capace, Boston, Mass., for plaintiffs.

William A. Brown, Asst. U. S. Atty., Boston, Mass., Danielle E. DeBenedictis, Boston, Mass., for defendants.

## OPINION

TAURO, District Judge.

Dorothy McInnis, Richard Cardeiro and Blanche Davis are residents of Massachusetts who are currently receiving benefits under the new federal Supplemental Security Income Program (S.S. I.) [1], 42 U.S.C. § 1381 et seq. They bring this action on behalf of themselves and all Massachusetts S.S.I. recipients challenging a decision by the Secretary of Health, Education and Welfare that they are no longer eligible to receive food stamps under the Food Stamps and Commodity Distribution Program. 7 U.S.C. § 2011; 7 U.S.C. § 1431 et seq.[2]

Jurisdiction is based on 28 U.S.C. § 1337.

Defendant Caspar W. Weinberger is Secretary of the United States Department of Health, Education and Welfare. HEW is the implementing agency for the S.S.I. program. 42 U.S.C. § 1383. Defendant Earl Butz is Secretary of the United States Department of Agriculture. As such, he is required to administer the Food Stamps and Commodity Distribution program. 7 U.S.C. § 2019.

Defendant Stephen A. Minter is the Commissioner of the Massachusetts Department of Public Welfare. His department administers public assistance programs in Massachusetts, including certification and issuance of food stamps. Com. ¶ 8, Defendant John F. Mungoran is responsible for the administration of grant-in-aid programs for bind public assistance recipients. He is the Commissioner of the Massachusetts Commission For the Blind.

Plaintiffs seek a declaration that Secretary Weinberger's action resulting in the elimination of Food Stamp and Commodity Distribution eligibility for Massachusetts recipients of S.S.I. benefits was invalid because it violated the requirements of the Food Stamp Act Amendments of 1973. P.L. 93–233 § 8(c). In addition, plaintiffs contend that defendant Weinberger's determination was violative of the Fifth Amendment of the United States Constitution.

The defendants maintain that they complied with the statute, and in so doing, did not violate the plaintiffs' constitutional rights.

---

1. The S.S.I. program was enacted as part of the 1972 Amendments to the Social Security Act.

2. The parties have stipulated:

That plaintiffs McInnis, Cardeiro and Davis and the class they represent are similarly situated and constitute a definite and ascertainable class in that:

1. All such persons are needy, aged, blind or disabled citizens of the Commonwealth of Massachusetts and of the United States;

2. All such persons are eligible for and receive benefits pursuant to the S.S.I. program;

3. All such persons are affected by the elimination of the categorical grant-in-aid programs of the Commonwealth of Massachusetts and the implementation of the S.S.I. program, which actions resulted in the loss of their eligibility for food stamps or commodities without a commensurate increase in their S.S.I. grant to compensate them for their loss of those food program benefits;

4. The members of the class are approximately 97,000 S.S.I. recipients in the Commonwealth of Massachusetts and it is impractical to bring them all before the Court;

5. There is a well-defined community of interest in questions of law and fact affecting the named plaintiffs and all others similarly situated;

6. The claims of the representative parties are typical of the claims of the class as a whole;

7. The representative parties will fairly and adequately protect the interests of the class as a whole; and

8. Defendants have acted on grounds generally applicable to the class, thereby making relief with respect to the class as a whole appropriate.

Accordingly, this court has allowed plaintiff's motion to certify this action as a class action under Fed.R.Civ.P. 23(b)(2).

Plaintiffs' request for a temporary restraining order against the defendants was granted following a hearing on May 8, 1974. At a further hearing on June 19, the parties agreed to postpone further action on the case until Congress either extended, amended or ignored P. L. 93–233 before its expiration date of June 30. On October 8, 1974, the parties submitted, on the pleadings and papers filed, for a decision on the merits.

## I.

### A.

On October 31, 1972, President Nixon signed into law H.R. 1 (P.L. 92–603, 42 U.S.C. §§ 1381 et seq.), a bill providing a guaranteed annual income for the aged, blind, and disabled. The bill amended Title XVI of the original Social Security Act (49 Stat. 620) and replaced a patchwork of state-administered assistance programs for the adult aged, blind and disabled with a streamlined plan for direct federal payments to eligible recipients. The new program, entitled Supplemental Security Income, was to take effect on January 1, 1974. *See* 58 Cornell L.Rev. 803 (1973).

Under the old "categorical" programs, the states had broad discretion to establish grant levels, resulting in wide disparities in the amount of assistance received by individuals throughout the country, and inadequate aid for many of the nation's most needy citizens. 42 U. S.C. § 301. *See* Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *cf.,* Baxter v. Minter, 378 F. Supp. 1213 (D.Mass.1974). *See also* Musgrave, Heller & Peterson, Cost Effectiveness of Alternative Income Main-

tenance Schemes, 23 Nat'l Tax J. 140 (1970). Under S.S.I., however, all recipients receive at least a minimum payment of $140 per month regardless of where they live.[3] *See* H.R.Rep. No. 231, 92d Cong., 1st Sess. 147 (1971). States then have the option of supplementing the federal payment to any level they choose.[4] 42 U.S.C. § 1382e; Welfare Law Survey—Developments in Welfare Law—1973, 59 Cornell L.Rev. 859, 887–92 (1974) [hereinafter Welfare Law Survey].

If a state decides to supplement the basic S.S.I. grant, it must chose between two supplementation plans. Welfare Law Survey 889. It can either administer the payment of S.S.I supplements itself or it can enter into an agreement with the Secretary of H.E.W. under which the federal government would administer the entire program. The second alternative would be vastly more efficient because a single agency would administer all state supplemental programs from Washington. *See* H.R.Rep. No. 24, 92d Cong., 1st Sess. 199 (1971).

In order to encourage the states to chose federal administration, Congress offered two financial incentives. First, all administrative costs would be borne by the federal government. 42 U.S.C. § 1382d; Blong & Thorkelson, State Supplementation of Benefits Under the Supplemental Security Income (S.S.I.) Program, 6 Clearinghouse Review 655 (March 1973). *See* Stipulation of Facts & Documents ¶ 12 [hereinafter Stipulation]. Second, and most significantly, if a state chose federal administration, it would be reimbursed for the costs resulting from increasing S.S.I. caseloads. 42 U.S.C. § 1382e note, as amended, Pub.L. No. 93–233, 87 Stat. 969; Stipulation ¶ 12. In the language of the com-

---

3. These assistance levels have since been increased. *See* P.L. 93–233 § 4(a)(1).

4. Additional amendments have placed some limits on state discretion. Under P.L. 93–66, § 212, states are now required to "mandatorily supplement" the payments of S.S.I. recipients whose payments under the new program are lower than their payments had

been under the old categorical programs. Stipulation ¶ 11. The classification of an S.S.I. recipient as a "mandatory" or "nonmandatory," however, does not affect his eligibility for food stamps. *See generally* Irizarry v. Weinberger, 381 F.Supp. 1146, 1150–1151 (S.D.N.Y.1974).

mentators, a state would be "held harmless" for the costs of supplementary payments over a predetermined level. Welfare Law Survey 889.

"Held harmless" is a term of art which means that the state is protected from future fiscal liability due to increasing caseloads by limiting such liability to the total amount of money that it paid under grant-in-aid programs in effect in calendar year 1972. However, the hold harmless amount only protects states against the costs of increased caseloads, not against increases in state supplementary payment levels.

Plaintiffs' Memorandum at 5. *See* California Legislative Council For Older Americans v. Weinberger, 375 F.Supp. 216, 219–220 (E.D.Cal.1974).

In order to determine whether a state is eligible for hold harmless benefits, and if so, to what degree, the state must make two calculations. First it must compute its adjusted payment level (A. P.L.). A.P.L. is an actuarial figure equal to the average amount of relief an otherwise indigent recipient would have received under the old categorical programs in January, 1972. 42 U.S.C. § 1382e note, *as amended* Pub.L. No. 93–233, 87 Stat. 969; Stipulation ¶ 13. The figure would no doubt differ from state to state and would also vary within each state for each of the categorical programs (i. e., aid to the aged, blind, disabled). In some states the A.P.L. would also include the "bonus value" of food stamps; a point which becomes important in determining whether S.S.I. recipients in that state are eligible to participate in the Food Stamp Program. Stipulation ¶ 13.

The second step is a calculation of the state's supplementary payment level (S. P.L.). This figure equals the total of the planned federal S.S.I. grant plus the state supplement. Like the A.P.L., the S.P.L. might also include the bonus value of food stamps. *Id.*

After these two calculations are made, the figures are then compared. If the A.P.L. and the S.P.L. are equal, the federal government will pay the state the difference between its 1972 expenditures for categorical assistance and its current expenditures under S.S.I. However, if the S.P.L. exceeds the A.P.L. the increased costs to the state attributable to that difference will not be assumed by Washington. *See* 42 U.S.C. § 1382e note, as amended, Pub.L. No. 93–233, 87 Stat. 969.

From a fiscal vantagepoint, it is to a state's advantage to set a supplementary payment level equal to, but not greater than, the adjusted payment level. *See* Irizarry v. Weinberger, 381 F.Supp. 1146, 1152–1153 (S.D.N.Y.1974).

### B.

On another front, Massachusetts, like other states, has participated in programs administered by the United States Department of Agriculture to increase the food purchasing power of impoverished Americans. Two alternative programs exist to accomplish this goal: the Food Stamp Program, 7 U.S.C. §§ 2011 et seq. and the Commodities Distribution Program, 7 U.S.C. § 1431. *See generally* Welfare Law Survey 892–93 ns. 196 & 197. By June 30, 1974, however, Massachusetts residents were eligible for benefits only under the Food Stamp Program. 7 U.S.C. § 2019(e)(8).

The Food Stamp Act of 1964 was enacted by Congress as one of the keystones of the War on Poverty. Welfare Law Survey 892. It was designed to provide an alternative to direct distribution of federal foodstuffs, to more efficiently provide an adequate nutritional level for low income households and to boost the agricultural economy. 7 U.S.C. § 2011.

Under the program, every eligible household receives a monthly coupon allotment for which it pays a percentage of its face value. 7 U.S.C. § 2013(a). The coupons may be used to purchase domestic and imported foods at stores certified by the Agriculture Department, 7 U.S.C. §§ 2012(b), 2015(b), 2019(h),

*cf.* Kentucky Fried Chicken v. United States, 449 F.2d 255 (5th Cir. 1971).

The number of coupons each household receives depends upon the number of individuals in that household. *See, e. g.,* 38 Fed.Reg. 8287 (1973); Parker, King & Maloney, Polyunsaturated Placebos for the Poor: Food Stamps, the Food Industry and Government Regulation, 17 How.L.J. 489, 505 (1972). The cost of those coupons, however, varies depending upon the household's income. Thus, while two families of four will receive the same monthly allotment of coupons, each might pay a different sum due to differences in their incomes. Welfare Law Survey 899–900. The difference between the face value of the coupons and their cost is called the "bonus value," and represents the benefit which each household receives through participation in the program.

### C.

The original S.S.I. enabling legislation contained a blanket exclusion of S.S.I recipients from eligibility in the Food Stamp and Commodity Distribution Programs. P.L. 92–603, § 411(a); H.R. Rep. 231, 92d Cong., 1st Sess. 196 (1971). *See* Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). To compensate for that loss, Congress encouraged the states to raise their S.P.L.s by approximately $10 which would theoretically account for the loss in food stamp benefits to S.S.I. recipients. P.L. 92–603, § 401(b)(1). Any state which increased its S.P.L. in that manner would be allowed to raise its A.P.L. by a corresponding amount, thereby increasing that state's credits toward "hold harmless." This increased A.P.L. is sometimes called the "maximum adjusted payment level."

As the January 1974 implementation date for S.S.I. drew near, however, it became apparent to many members of Congress that thousands of S.S.I. recipients under the new program would suffer a substantial decrease in total benefits due to the loss of food stamp eligibility. *See, e. g.,* 119 Cong.Rec.S. 10735 (daily ed. June 8, 1973) (remarks of Sen. Kennedy). Accordingly, on August 10, 1973, the original S.S.I. legislation was amended by P.L. 93–86 to allow S.S.I. recipients to remain eligible for food stamps under certain circumstances. Under the revised plan, an S.S.I. recipient would be allowed to obtain food stamps unless he was receiving as much under S.S.I. as would have been received under both categorical assistance and food stamps before January 1974. Thus, if a recipient of aid to the blind had been receiving $150 cash per month, plus a monthly allotment of food stamps with a bonus value of $25, he would remain eligible for food stamps after January 1974, unless his total aid under S.S.I. equaled or exceeded $175 per month.[5]

This amendment produced serious administrative problems. Elaborate calculations had to be made for each of the thousands of S.S.I. recipients in order to determine whether any recipient was eligible to receive food stamps. *See* California Legislative Council For Older Americans v. Weinberger, 375 F.Supp. at 220 n. 15. Because neither government computers nor H.E.W. personnel could complete this task within a reasonable time, Congress replaced P.L. 93–86 with P.L. 93–233.

The new amendment was signed into law on December 31, 1973; the day before S.S.I. was to go into effect. Under its provisions, the implementation of P.L. 93–86 was postponed until July 1, 1974. (Subsequent legislation extended that deadline to July 1, 1975. P.L. 93–335.) Most significantly, P.L. 93–233 temporarily ended almost all interrelationship between the food stamp and S.S.I. programs. S.S.I. recipients could now participate in the food stamp program so long as they qualified under that program's standards. The fact that an individual would be receiving more in aid in 1974 by a combination of food stamps

---

5. The figures in the text are used for purposes of illustration only.

and S.S.I. than his total of food stamps and categorical assistance in 1973 was no longer relevant.

But one problem remained. Some states had taken advantage of the provisions of the original legislation and had made plans to increase S.S.I. payments to compensate their recipients for the loss in food stamps which had been initially contemplated. Welfare Law Survey 887 n. 176. If S.S.I. recipients in these "cash out" states were to once again become eligible for food stamps they would theoretically be receiving the same benefits under both programs. Moreover, the states which had "cashed out" were entitled to a special bonus under "hold harmless." In many instances those additional monies had already been allocated. 1974 U.S.Code Cong. & Admin.News, pp. 3183–3184. In light of these difficulties, P.L. 93–233 provided that S.S.I. recipients in cash out states would remain ineligible for food stamps. P.L. 93–233, § 8.

The Secretary of H.E.W. has determined that Massachusetts is one of those cash out states and it is that finding which is under challenge here. Stipulation ¶ 16.

## II

The plaintiffs are all citizens of the United States and Massachusetts residents. Stipulation ¶ ¶ 1, 3, 5. Prior to January 1, 1974, plaintiff Dorothy McInnis was a recipient of benefits from the Aid to the Disabled program administered by the Commonwealth. Stipulation ¶ 2. Prior to the same date, plaintiff Richard Cardeiro received benefits from Massachusetts' Disability Assistance Program, as did plaintiff Blanche Davis from the Old Age Assistance Program of the Commonwealth. Stipulation ¶ ¶ 4, 6.

Plaintiffs McInnis, Cardeiro and Davis were eligible for the new Supplemental Income program on January 1, 1974, and were simultaneously terminated from the prior federally aided state grant-in-aid programs. Stipulation ¶ 10.

On August 16, 1973 defendant Minter submitted to H.E.W. Massachusetts' adjusted payment level figures for use in calculating how much protection the state would receive pursuant to the "hold harmless" provision. Stipulation ¶ 21.

The adjusted payment level included the amount of money which an individual with no income received in January 1972 plus $10 to account for the bonus value of food stamps. The adjusted payment level was computed as of January 1972 for each of the three prior welfare programs. Stipulation ¶ 20. The adjusted payment level figures provided H.E.W. on August 16, 1973 were:

| | | |
|---|---|---|
| Old Age Assistance | 223.50 | per individual |
| Disability Assistance | 214.90 | " " |
| Aid to the Blind | 242.50 | " " |

Stipulation ¶ 21.

For a single individual living alone, the average payments in December, 1973 were:

| | |
|---|---|
| OAA | 221.00 |
| DA | 212.00 |
| AB | 242.50 |

Stipulation ¶ 22.

In arriving at the Massachusetts optional supplemental payment level, the defendant Minter or his employees took into account the projected average payment to an individual in each categorical aid program as of December, 1973; but to arrive at the final supplementary payment level, the average payments for December, 1973 were increased to equal the adjusted payment level which had been determined in August, 1973. As a consequence, the supplementary payment levels were:

| | |
|---|---|
| OA | 223.50 |
| DA | 214.90 |
| AB | 242.50 |

Stipulation ¶ 23.

On January 16, 1974, defendant Weinberger notified defendant Minter of his determination that the provisions of P.L. 93–233, § 8(c) applied to the

Commonwealth and further notified defendant Minter of the options of the Commonwealth. Stipulation ¶ 16.

On January 18, 1974, defendant Minter notified officials of Health, Education and Welfare that Massachusetts chose to retain the bonus value of food stamps in its adjusted payment level. Stipulation ¶ 17.

Acting pursuant to the Secretary's finding, and the Commonwealth's election, Commissioner Minter notified plaintiffs and all other S.S.I. recipients that they would be ineligible to participate in the food benefit programs as of February 28, 1974. Stipulation ¶ 19.

Plaintiff Dorothy McInnis received $207.90 under the categorical program and received food stamps with a bonus value of $26, totaling $233.90. Her S.S.I. grant as of the complaint filing date (April 24, 1974) was $214.90, a net loss of $19.00 a month in purchasing power. Comp. ¶ 2.

Plaintiff Richard Cardeiro is a disabled S.S.I. recipient living in Massachusetts. Until February 28, 1974, he was a participant in the Food Stamp program. Plaintiff Cardeiro was able to purchase food stamps with a value of $42.00 at an actual cost of $21.00. As a result of the food stamp program, plaintiff Cardeiro had an increased food purchasing power of $21.00 per month. Although his S.S.I. grant is $2.20 greater than his prior grant from Massachusetts, the S.S.I. grant does not include any sum designed to compensate him for the loss of food stamps. As result of the loss of food stamps, plaintiff Cardeiro has suffered a loss of $18.80 per month in food purchasing power. Comp. ¶ 3.[6]

Plaintiff Davis is an aged S.S.I. recipient living in Massachusetts. Until February 28, 1974, she was entitled to receive foodstuffs through the Commodity Distribution program. As a participant in this program, plaintiff Davis was able to obtain, on a monthly basis, butter, macaroni, canned vegetables and canned milk at no cost. Although her S.S.I. grant is no greater than her prior grant from Massachusetts, plaintiff Davis has been denied an opportunity to participate in any federal food distribution program. As a result of this denial, plaintiff Davis has less food under the S.S.I. program than she had under the prior grant-in-aid program. Comp. ¶ 4.

### III

At the outset, this court must dispose of two threshold questions. Is the Secretary's decision subject to judicial review? If so, what is the scope of that review?

Because the statutes at issue in this case do not include provisions for judicial review of the Secretary's decision, the court must turn to the Administrative Procedure Act for guidance.[7]

### A.

Section 10(a) of the Administrative Procedure Act (5 U.S.C. § 702) provides that: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." The definition of "agency" in the introductory clause of § 10 includes the Department of Health, Education and Welfare (see Cappadora v. Celebrezze, 356 F.2d 1 (2d Cir. 1966) (Friendly, J.) and precludes review under § 10(a) *only* upon a showing that "(1) [the] statutes preclude judicial review or (2) agency action is by law committed to agency discretion."

Neither H.E.W.'s enabling legislation (42 U.S.C. §§ 3501 et seq.) nor the subsequently enacted Food Stamp (7 U.S.C. §§ 2011 et seq.) or S.S.I. (42 U.S.C. §§ 1381 et seq.) programs offer any

---

6. Presumably through typographical error, the complaint lists plaintiff Cardeiro's economic loss as $18.90 per month.

7. 7 U.S.C. § 2022, allowing judicial review of the Secretary's denial of a retail store's application to participate in the Food Stamp Program, is not applicable here.

indication that Congress sought to prohibit judicial review in this area. Certainly absent is the "clear and convincing" evidence of such an intent required before this court can abstain from deciding the instant case. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). *See also* Irizarry v. Weinberger, 381 F.Supp. 1146 (S.D. N.Y.1974); California Council For Older Americans v. Weinberger, 375 F.Supp. 216 (E.D.Cal.1974).

Likewise, the Secretary's determination does not fall within the definition of actions "committed to agency discretion." The legislative history of the A. P.A. indicates that this exception is a very narrow one, relevant only when a statute is "drawn in such broad terms that in a given case there is no law to apply." S.Rep.No. 752, 79th Cong. 1st Sess. 26 (1945). *See* Citizens To Preserve Overton Park v. Volpe, 401 U.S. at 410, 91 S.Ct. 814; United Electrical Contractors v. Ordman, 258 F. Supp. 758 (S.D.N.Y.), aff'd per curiam, 366 F.2d 776 (2d Cir. 1966); cert. denied, 385 U.S. 1026, 87 S.Ct. 753, 17 L. Ed.2d 674 (1967); (refusal of N.L.R.B. general counsel to issue unfair labor practice complaint); Oscar Mayer & Co. v. United States, 268 F.Supp. 977 (W. D.Wis.1967) (refusal of I.C.C. to suspend proposed rates); Sugarman v. Forbragd, 267 F.Supp. 817 (N.D.Cal. 1967) (denial of permission to import certain foods). *See generally* Saferstein, NonReviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367 (1968). The exception applies only when the administrative official in question has some choice in the decision that he makes and is free to select among a variety of remedies, or [is] authorized to assign varying weights to any relevant factors." Saferstein, *supra,* at 380.

### B.

A more significant problem is determining the scope of review to be afforded the Secretary's decision. Section 10(e) of the Administrative Procedure Act provides that in all cases where reviewable administrative action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, [procedural or constitutional standards]" it must be set aside. 5 U.S.C. § 706(2)(A), (B), (C), (D). In certain limited instances, an agency action may be set aside if it is found not to be supported by "substantial evidence." 5 U.S.C. § 706(2)(E). And in other unusual situations, an agency action may be set aside if *de novo* review causes a court to conclude that the administrative action was "unwarranted by the facts." 5 U.S.C. § 706(2)(F).

The substantial evidence standard is relevant only when agency action is taken pursuant to the rulemaking provisions of the A.P.A. (5 U.S.C. § 553) or when the agency action is based upon a public adjudicatory hearing. 5 U.S.C. §§ 556, 557. *But see* Wright: The Courts and the Rulemaking Process: The Limits of Judicial Review, 59 Cornell L. Rev. 375 (1974). The Secretary's decision that Massachusetts had cashed out its food stamp benefits was plainly not an exercise of rulemaking authority; nor did the act require any prior public hearing before the Secretary announced his decision.

Likewise *de novo* review of whether the Secretary's decision was "warranted by the facts" is also inappropriate. That standard may be applied only with the agency determination is of an adjudicatory nature and the agency fact finding procedures are inadequate or when the agency decision is nonadjudicatory but new issues are raised in a procedure to enforce the nonadjudicatory action. *See* Citizens To Preserve Overton Park v. Volpe, 401 U.S. at 415, 91 S.Ct. 814. H.R.Rep. No. 1980, 79th Cong., 2d Sess. 1946. None of these situations is present here.

The court is left then with a standard of review which limits inquiry to whether the Secretary's finding was "arbitrary, capricious, an abuse of dis-

cretion, or otherwise not in accordance with law." California Council for Older Americans, 375 F.Supp. at 228–230. "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U.S. at 416, 91 S.Ct. at 823–824; Jaffe, Judicial Control of Administrative Action 182. *See* McBee v. Bomar, 296 F.2d 235, 237 (6th Cir. 1961); Western Addition Community Organization v. Weaver, 294 F. Supp. 433 (N.D.Cal.1968). Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Secretary's determination is entitled to a presumption of regularity, and the court is certainly not empowered to substitute its judgment for that of the agency. Citizens to Preserve Overton Park v. Volpe, 401 U.S. at 416, 91 S.Ct. 814.

### IV.

### A.

The gravamen of the plaintiff's complaint is that Secretary Weinberger misinterpreted a key section of P.L. 93–233 and used an incorrect formula for determining whether a state had included the bonus value of food stamps in its supplemental S.S.I. payment. They argue that only through this erroneous construction of the statutory language did the Secretary find that Massachusetts had cashed out. Thus his decision was arbitrary, capricious and not in accordance with law.

Section 8(a)(1) of P.L. 93–233 provides:

Section 3(e) of the Food Stamp Act of 1964 is amended effective only for the 6-month period beginning January 1, 1974 to read as it did before amendment by Public Law 92–603 and Public Law 93–86, but with the addition of the following new sentence at the end thereof:

"For the 6-month period beginning January 1, 1974 no individual, who receives supplemental security income benefits under title XVI of the Social Security Act, State supplementary payments described in section 1616 of such Act, or payments of the type referred to in section 212(a) of Public Law 93–66, shall be considered to be a member of a household or an elderly person for purposes of this Act for any month during such period, if, for such month, such individual resides in a State which provides State supplementary payments (A) of the type described in section 1616(a) of the Social Security Act, and (B) the level of which has been found by the Secretary of Health, Education, and Welfare to *have been specifically increased so as to include the bonus value of food stamps.*" (Emphasis supplied).

Section 8(c) of P.L. 93–233 provides:

For purposes of the last sentence of section 3(e) of the Food Stamp Act of 1964 (as amended by subsection (a) of this section) and subsections (b)(3) and (f) of this section, the level of State supplementary payment under section 1616(a) shall be found by the Secretary to have been specifically increased so as to include the bonus value of food stamps (1) *only if*, prior to October 1, 1973, the State has entered into an agreement with the Secretary or taken other positive steps which demonstrate its intention to provide supplementary payments under section 1616(a) at a level which is at least equal to the maximum level which can be determined under section 401(b)(1) of the Social Security Amendments of 1972 and which is such that the limitation on State fiscal liability under section 401 does result in a reduction in the amount which would otherwise by payable to the Secretary by the State, and (2) only with respect to such months as

the State may, at its option, elect. (emphasis supplied).

Although this legislation was enacted only months ago, it has already had the benefit of judicial interpretation. In California Legislative Council For Older Americans v. Weinberger, 375 F.Supp. at 221, the court explained what the Secretary of H.E.W. had to do to find that a state had cashed out within the meaning of P.L. 93–233, § 8. It states:

> P.L. 93–233, § 8 requires the Secretary to make, in effect, two findings: (1) that in fact the state's payments were increased specifically to include the bonus value of food stamps, and (2) that the state had the requisite intention prior to October 1, 1973, to raise its payments to a level invoking the 'hold-harmless' provision, P.L. 92–603, § 401, as demonstrated by agreement with the Secretary or by other positive steps. (Footnote omitted)

It is the court's first requirement which the plaintiffs claim that Secretary Weinberger failed to meet here.

■ In plaintiffs' view of the statute, the words "specifically increased" should be equated with "specific intent," meaning that the Secretary can make a finding that a state has cashed out only if that state has increased its S.S.I. payments with knowing intent of including in those payments the bonus value of food stamps. Thus, under plaintiffs' view, if a state labels an increase in S. S.I. payments a "cost of living adjustment" or offers no explanation for its action, that state cannot be found to have cashed out.

The defendants agree that the key language of the statute is the phrase "specifically increased" in § 8(a)(1),

but the defendants would look to § 8(c) to define that term. According to this interpretation, the Secretary can find that a state has "cashed out" so long as the state has taken some steps to raise its supplementary payment level to a level equal to its original adjusted payment level plus $10.00. If the figures correspond, the Secretary must find that the state has cashed out. P.L. 93–233 § 8.[8]

In view of its legislative history, the defendants' view of the statute is the most plausible.

Section 8 was enacted as an interim measure to provide some temporary coordination between the food stamp and S.S.I. programs. Prior to the enactment of P.L. 93–233, Congress had been ambivalent about the eligibility of S.S.I. recipients for food stamps. At first it had exluded them from the food stamp program. Subsequently, it partially reversed itself, and allowed S.S.I. recipients to receive food stamps in order to maintain their total 1974 benefits at 1973 levels. That change of mind, however, generated a host of administrative problems. As S.S.I.'s implementation date approached, the Congress on short notice had to develop a mechanism which would allow the program to become operational with a minimum of confusion, yet not unduly penalize those receiving initial payments under S.S.I.

Under these circumstances, it is unlikely that the fathers of S.S.I. would have settled upon the formula which the plaintiffs now theorize they did. P.L. 93–233 was signed into law on December 31, 1973, one day before the S.S.I. program became operational. When the legislation was being drafted and debated in late-1973, its sponsors were undoubtedly aware that, following its ap-

---

**8.** The plaintiffs would read Section 8(c) as establishing *additional* criteria which a state must meet before the Secretary may conclude that it has cashed out. The first sentence of § 8(c), however, belies that interpretation. It opens with the clause "[f]or the purposes of the last sentence of Section 3(e) (as amended by subsection (a) of this section)" and then goes on to list what it

characterizes as the "only" basis upon which the Secretary may make a finding that a state has cashed out. Reading the two sections together, it appears that Congress enacted Section 8(c) to carefully tailor the phrase "specifically increase" to fit the context of this statutory scheme, rather than adding further complexity to it.

proval, the Secretary would be required to make a series of rapid decisions in order to determine which states had cashed out and which S.S.I. recipients were thereby ineligible for food stamps. Were the Secretary required to make detailed findings on legislative and administrative decision-making in *each* state to determine that state's *motive* for setting its supplementary payment at a certain level, the implementation of S.S.I. would have been delayed considerably. Accordingly, Congress avoided those complexities and enacted legislation under which it was sufficient for him to find a cash out if the state's S.S.I. payments equalled a particular monetary amount.

Plaintiffs correctly point out that under this interpretation of the statute, S.S.I. recipients in cash out states might suffer some economic loss. They all receive $10.00 compensation for the lost bonus value of food stamps, even though many S.S.I. recipients would have been eligible for greater food benefits had they simply applied for allotments under the food stamp program itself.[9] That complaint, however, is not determinative here. In enacting P.L. 93–233 Congress balanced its desire to provide full food stamp benefits to all S.S.I. recipients against the administrative chaos which a carelessly drafted plan for doing so would surely create. The interim solution which it finally enacted is at least arguably less than perfect, but it is the solution which Congress chose. This court can do nothing more than see that it is not arbitrarily or capriciously administered by the Secretary of Health, Education and Welfare.

#### B.

■ In view of this court's interpretation of Section 8, Secretary Weinberger's decision is neither arbitrary nor capricious. The Massachusetts A.P.L. includes both the amount of money which a categorical aid recipient with no other income received in January, 1972, plus $10.00 to account for the bonus value of Food Stamps. The A.P.L. figures provided the Department of Health, Education and Welfare on August 16, 1973, were $223.50 per individual for Old Age Assistance, $214.00 per individual for Disability Assistance and $242.50 per individual for Aid to the Blind.

When Massachusetts computed its optional S.P.L., defendant Minter took into account the projected average payment an individual in each categorical aid program received in 1973. But to arrive at the final S.P.L. submitted to Washington and the Massachusetts General Court, these payments were raised to equal the A.P.L. which had already been computed. As such, Massachusetts met the requirements of Section 8(c) of P.L. 93–233 and specifically increased its optional S.S.I. payments to include the bonus value of food stamps.

#### V.

Plaintiffs make the further argument that if this court's interpretation of Section 8 is accepted, that portion of P.L. 93–233 deprives S.S.I. recipients of Due Process of Law under the Fifth Amendment to the United States Constitution. United States Department of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). Plaintiffs argue that this construction not only illegally discriminates against Massachusetts S.S.I. recipients, but also creates an unconstitutional presumption that plaintiffs are being compensated for their loss of food stamps when indeed they are not.

Although the Fifth Amendment does not contain an equal protection clause, "it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" Schneider v. Rusk, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964); see Frontiero v. Richardson, 411 U.S. 677, 680 n. 5, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); Shapiro v. Thompson, 394 U.S. 618, 641–642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Boll-

9. *See* pages 387–388, *supra.*

ing v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). And in order to test compliance with the Fifth Amendment, this court must use traditional equal protection analysis to examine classifications made in the Food Stamp Program. United States Department of Agriculture v. Moreno, *supra;* United States Department of Agriculture v. Murry, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973).

Plaintiffs maintain that this court's interpretation of P.L. 93–233 § 8, creates two classes of food stamp recipients. One class consists of recipients in non-cash out states who receive food stamps.[10] The other consists of Massachusetts S.S.I. recipients who are equally entitled to such benefits under the Food Stamp Program, but who have been denied them by P.L. 93–233.

■ Traditional equal protection analysis requires that the government treat equally situated individuals differently only when the classification is reasonable, not arbitrary, and is related to a legitimate governmental objective. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). This test of "minimal rationality" has been held by the Supreme Court to be the appropriate standard to apply to questions involving welfare benefits. Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1971). As the court noted in Dandridge v. Williams, 347 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970):

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or be-

cause in practice it results in some inequality." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, [31 S.Ct. 337, 340, 55 L.Ed. 369]. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70, [33 S.Ct. 441, 443, 57 L.Ed. 730]. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426 [81 S.Ct. 1101, 1105, 6 L.Ed.2d 393].

■ The classification in the instant case clearly meets the *Dandridge* test. The ineligibility of Massachusetts S.S.I. recipients for food stamps is the result of a long series of legislative attempts to coordinate these two highly complex welfare plans. That task remains unfinished. But until it is, some discrimination against some S.S.I. recipients is inevitable. Given the difficulties which Congress has had, fitting these two programs into a coherent scheme, and the temporary status of the provisions which the plaintiffs now attack, the court cannot conclude that the disparity resulting from the passage of P.L. 93–233 is unreasonable under the circumstances.

Plaintiffs also argue that by enacting P.L. 93–233 Congress has created an irrebutable presumption that S.S.I. recipients in cash out states are being fully compensated for their loss of food stamps when this is in fact not the case. As such they would have this court hold that the statute violates the Due Process Clause of the Fifth Amendment. Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973).

Plaintiffs' argument misconceives both the meaning of an irrebutable presumption and the purpose of P.L. 93–233. To be sure, the Court has shown

---

10. The class would also include S.S.I. recipients not receiving food stamps but living in states which have "properly" cashed out.

*See, e. g.,* N.Y. Social Services Law § 131–a(8) (McKinney's Consol. Laws, c. 55, 1974).

increasing skepticism toward "legislation by presumption" because such legislation might *permanently* deprive citizens of important rights which more carefully drawn statutes would afford. In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), for example, the Court struck down an Illinois law containing an irrebutable presumption that all unwed fathers were unfit to be parents. And just last term in Cleveland Board of Education v. La-Fleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), the Court rejected local school board rules which irrebutably presumed that all women in the fourth and fifth months of pregnancy were not qualified to teach in the public schools. *See also* Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). In each of these cases, the Court held that the Due Process Clause forbids permanent and irrebutable presumptions when those "presumptions are not necessarily or universally true in fact, and when the State has reasonable alternative means of making the crucial determination." Vlandis v. Kline, 412 U.S. 441, 452, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63 (1973).

P.L. 93–233, however, does not present these difficulties. Far from representing a presumption that S.S.I. recipients in cash out and non-cash out states are treated equally, P.L. 93–233 is an admission that they are not. Congress is now fully aware of the inequities which have been created in the implementation of S.S.I. But rather than permanently ignoring them in the name of legislative convenience, it has imposed upon itself a deadline for their resolution. Certainly nothing in the Constitution or in recent case law allows this court to interject itself at this important phase of the legislative process merely to strike down the imperfections which remain in the interim.

Accordingly, this court holds that Secretary Weinberger's determination that Massachusetts S.S.I. recipients are ineligible to participate in the Food Stamp Program comports with the requirements of P.L. 93–233. Moreover, the court concludes that § 8 of that statute does not violate the Due Process Clause of the Fifth Amendment to the United States Constitution. Plaintiffs' claim is, therefore, dismissed.

So ordered.