**Dorothy McINNIS et al.,
Plaintiffs-Appellants,**

v.

**Caspar W. WEINBERGER et al.,
Defendants-Appellees.**

**No. 75–1119.**

United States Court of Appeals,
First Circuit.

Argued Sept. 4, 1975.

Decided Feb. 5, 1976.

---

56

Michael David Rosenberg, with whom Charles R. Capace, Boston, Mass., Valerie Vanaman, Philip Hamilton, K. Diane Cohn, and Leonard Rubenstein, Cambridge, Mass., were on brief, for plaintiffs-appellants.

Danielle E. deBenedictis, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for Commissioners of The Department of Public Welfare and The Commission For The Blind of The Commonwealth of Massachusetts, defendants-appellees.

William A. Brown, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., Boston, Mass., was on brief, for Caspar W. Weinberger, and others, defendants-appellees.

Before COFFIN, Chief Judge, McENTEE, Circuit Judge, and THOMSEN,* Senior District Judge.

COFFIN, Chief Judge.

Plaintiffs, Massachusetts recipients of Supplemental Security Income (SSI),[1] attack the statutory interpretation underlying a determination by the Secretary of Health, Education, and Welfare that they are no longer eligible for food stamps. Primarily, they charge that the Secretary has misread the statute; secondarily, they raise due process and equal protection claims under the Fifth Amendment. The district court upheld the Secretary's interpretation of the statute and found no constitutional defect. 388 F.Supp. 381 (D.Mass.1975). We affirm.

Resolution of the statutory issue involves threading our way through a sequence of statutes enacted to accomplish significant changes in the administration of welfare assistance to the aged, blind and disabled.[2] In January, 1974, the system of federal matching grant programs for these recipients[3] was replaced by SSI—the fundamental provision of which is a federal guarantee of a uniform minimum monthly income.[4] Encouragement to the states to supplement this federal payment,[5] with federal administration of the supplement,[6] was contained in 42 U.S.C. § 1382e(d), providing for the federal government to assume all administrative costs, and in P.L. 92–603, § 401, codified at 42 U.S.C. § 1382e note, allowing federal reimbursement of certain state assistance expenditures. Specifically, § 401 provides that the states will be "held harmless" for any increase in annual state expenditures over 1972 assistance expenditures, to the extent that the current payment level does not exceed the "adjusted payment level" (APL) —defined (by § 401(b)(1)) as the relief an otherwise indigent recipient would have received under the categorical programs in effect in the state during January, 1972. Congress thus sought to alleviate state fears by absorbing costs which might arise due to the change to an income maintenance approach, federal ad-

---

* Of the District of Maryland, sitting by designation.

1. The Supplemental Security Income program was introduced by the Social Security Amendments of 1972, Act of Oct. 30, 1972, P.L. 92–603, 86 Stat. 1329, and is codified at 42 U.S.C. § 1381 et seq. (1974). By § 301, this Act amended Title XVI of the Social Security Act in its entirety (except as to Guam, Puerto Rico, and the Virgin Islands, see § 303(b)), effective January 1, 1974.

2. We shall attempt to avoid as much as possible the miasma of statutory material surrounding the essentials of this case. For more detailed analyses, see McInnis v. Weinberger, 388 F.Supp. 381 (D.Mass.1975); Irizarry v. Weinberger, 381 F.Supp. 1146 (S.D.N.Y.1974), and California Legislative Council for Older Americans v. Weinberger, 375 F.Supp. 216 (E.D.Cal.1974).

3. Under this system of categorical programs, assistance was based on individual assessments of need. The states could establish their own grant levels, and there were, in fact, wide variations in the amount of assistance received by individuals in different states. For the basic provisions of these supplanted programs, see 42 U.S.C. §§ 301 (aged), 1201 (blind), and 1351 (disabled) (1970).

4. This approach "represented a philosophical departure from a welfare system based on need to one based on income maintenance." Irizarry, supra, at 1149. Initially, the uniform federal figure was set at $130 for an individual and $195 for a couple, P.L. 92–603, § 301. These figures were changed to $140 and $210 effective January 1, 1974, and to $146 and $219 effective July 1, 1974, by P.L. 93–233, § 4.

5. States originally had the option to supplement at any level, 42 U.S.C. § 1382e. Under later legislation, however, they were required to provide those recipients who had been on the rolls under the superseded programs for December, 1973, at least the same cash benefit as before. P.L. 93–66, § 212(a); see Irizarry, supra at 1151.

6. States have the option to administer their supplement themselves, but Congress wished to encourage central administration of all state supplemental programs because of the potential for greater efficiency. See 388 F.Supp. at 384.

ministration, and uniform federal eligibility standards, while at the same time not funding increased benefit levels which the states might choose to provide. *See* H.Rep.No.92–231, 1972 U.S.Code Cong. & Admin.News at 5187; *Irizarry, supra* at 1149–50; *California Legislative Council, supra* at 219–20..

The original legislation also declared that SSI recipients would be ineligible for food stamps, P.L. 92–603, § 411(a), and correspondingly encouraged states to counteract that loss by offering to raise the ceiling on federal reimbursement ("hold harmless") to include annual cost excesses over 1972 to the further point where the current benefit level did not exceed the "maximum APL"—the APL augmented by "an amount which does not exceed the sum of (A) . . . and (B) the bonus value of food stamps in such State for January 1972." P.L. 92–603, § 401(b)(1).[7]

However, few states planned to take advantage of this provision,[8] with the threatened result that SSI recipients generally would receive neither food stamps nor a cash equivalent.[9] Con-

7. Under the food stamp program, which was intended to help provide adequate nutrition for low income households, each eligible household receives a monthly coupon allotment for which it pays a percentage of the coupons' face value. The number of coupons each household receives depends upon the number of persons in it, and the cost of coupons varies depending on the household's income. The difference between the face value of the food stamps and their cost to the particular household is called the "bonus value" and represents the benefit which each household receives through participation in the program. Under P.L. 92–603, § 401(b)(3), however, the Secretary of Agriculture was instructed to determine an average amount to represent the bonus value of food stamps for all recipients of categorical grant programs in the particular state under benefit levels in effect for January, 1972. For Massachusetts, the Secretary determined that amount to be $10 per person per month.

8. This was due primarily to the fact that few states were in a realistic position to do so, because they could not qualify for the basic hold harmless provision in the first place. Only eight states were subject to the basic provision, H.Rep.No.93–627, 93d Cong., 1st Sess., 1973 U.S.Code Cong. & Admin.News at 3184. The most obvious ineligibles would be those states whose APL's were less than $140, *see id.* at 3183; Blong & Thorkelson, *State Supplementation of Benefits Under the Supplemental Security Income Program,* 6 Clearinghouse Review 653 (March 1973); it was impossible for them to reach the hold harmless expenditure "floor" (the 1972 state expenditure level, below which there was no federal reimbursement) without exceeding the hold harmless "ceiling" (the APL, above which there was no reimbursement), because the entire current benefit level up to that ceiling was being paid by the federal government. The mathematics also strongly affected those states with APL's only slightly above the federal uniform level of $140. Under the categorical programs, the states had funded 50% of assistance grants actually paid out, *see, e. g., Irizarry, supra* at 1149; now that the federal share was so much larger, it would require quite an increase in total payments for the state's current expenditures to exceed its 1972 costs at the same benefit level. Thus, a state with an APL of $150 (of which it paid $75), would now pay only $10 to reach the $150 level. Its caseload would have to increase seven and a half times in order for it to spend the same as it had in 1972 (except to the extent that other factors increased its total payments); only in the states with more liberal APL's would the 1972 level be reached with less than a doubling of the caseload. It was theoretically possible under § 401, but meaningless in practical terms, to raise the APL if expenditures did not, by exceeding 1972 expenditures, generate some federal reimbursement.

9. Congress also appears to have been motivated to act by other inequities inherent in the original legislation. First, the bonus value as determined by the Secretary of Agriculture for each state was an average, and all whose benefits had been on the high side of the averaging process would receive less. Second, that "bonus value" figure reflected January, 1972, food stamp levels, outdated as of the start of SSI two years later. While those concerns would have been alleviated by P.L. 93–86, discussed in note 10 *infra,* P.L. 93–233 does not offer a solution to them except to the extent that it limits the possibility of more states taking advantage of its own "cash out" provision—under which recipients only in those states which provided increased benefits in line with the augmented APL under § 401 were made food stamp ineligible—while Congress decides how it ultimately wishes to mesh the two programs.

gress' ultimate solution to this problem,[10] on the eve of the program's implementation,[11] was to restore food stamp eligibility except in those states in which the level of payments had been found by the Secretary of Health, Education and Welfare "to have been specifically increased so as to include the bonus value of food stamps." P.L. 93–233, § 8(a)(1). It also withdrew from states which had not yet made such a "specific increase" the option of receiving augmented reimbursement for doing so. § 8(d–e). And in § 8(c) Congress declared that the level of a state's payments "shall be found by the Secretary to have been specifically increased so as to include the bonus value of food stamps (1) only if, prior to October 1, 1973, the State has entered into an agreement with the Secretary or taken other positive steps which demonstrate its intention to provide supplementary payments . . . at a level which is at least equal to the maximum level which can be determined under section 401(b)(1) of the Social Security Amendments of 1972 and which is such that the limitation on State fiscal liability under section 401 does result in a reduction in the amount which would otherwise be payable to the Secretary by the State . . . ."

Massachusetts' actions under these statutes are not seriously in question. On August 16, 1973, in planning for the commencement of SSI, the state submitted figures to HEW reflecting its January, 1972, adjusted payment level augmented by $10—which is an amount equal to the bonus value of its food stamps—thereby manifesting an intention to invoke the maximum reimbursement possible under § 401.[12] And in January, 1974, pursuant to a state law passed December 12, 1973,[13] the benefit levels actually implemented matched these augmented figures. Furthermore, at these levels Massachusetts' costs exceeded its 1972 share of categorical assistance payments, qualifying the state for reimbursement for the excess. Thus, it is uncontested that Massachusetts satisfied the "only if" requirements of § 8(c). The HEW Secretary so found in January, 1974, and he accordingly ruled that Massachusetts qualified for augmented reimbursement under § 401 and that the state's SSI recipients were no longer eligible for food stamps after February, 1974.[14]

---

**10.** An unsuccessful attempt to solve the problem, as well as the concerns outlined in note 9 *supra,* was P.L. 93–86, § 3(b). Under that amendment, passed in August, 1973, food stamp eligibility would have been restored to an SSI recipient unless his support equalled what he would have received from categorical assistance plus food stamps in December, 1973. Because of the complex calculations required to determine food stamp eligibility for each recipient, and the short time available until the start of the SSI program, implementation of this amendment proved too difficult. P.L. 93–233, § 8(a)(2), postponed such implementation until July 1, 1974; the deadline was extended to July 1, 1975 by P.L. 93–335, and then until July 1, 1976 by P.L. 94–44.

That P.L. 93–86 did not purport to affect the maximum APL "hold harmless" provisions of P.L. 92–603, § 401, is made clear by H.Conf. Rep.No.93–427, reported at 1973 U.S.Code Cong. & Admin.News at 1851: "Nothing in this amendment [§ 3(b)] would affect the provisions of section 401 of the Social Security Amendments of 1972, which provides a limitation on fiscal liability of States for optional State supplementation, including the cashing out of food stamps, under the supplemental security income program." States could still cash out; but as to any individual for whom averaging or outdated standards created a decrease in total benefits, food stamp eligibility would have been restored if the individual qualified under that program's standards.

**11.** P.L. 93–233, 87 Stat. 947, passed both houses in final form on December 21, 1973, and was signed on December 30. Different portions of § 8 of this law are codified as an amendment to § 3(e) of the Food Stamp Act, 7 U.S.C. § 2012(e) (1974) and as an amendment to Title XVI of the Social Security Act, 42 U.S.C. § 1382e *note* (1974).

**12.** The precise figures (including the $10) were:

| | |
|---|---|
| Old Age Assistance | $223.50 |
| Disability Assistance | $214.90 |
| Aid to the Blind | $242.50 |

**13.** Mass.G.L. c. 118A (1974). The benefit levels are set out in St.1973, c. 1210, § 35.

**14.** *See Irizarry, supra* at 1152 note 10; *California Legislative Council, supra* at 222.

It is also true, however, that during the summer and fall of 1973, Massachusetts implemented two statutorily mandated cost-of-living increases, by virtue of which the benefit level as of December, 1973, had grown to more than $7 above the January, 1972, level.[15] Thus, the cash increase from the end of the old programs to the start of the new ranged from zero to $2.90; and with the end of the food stamp eligibility, the net effect was a substantial reduction in purchasing power for the plaintiff class. Citing *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the plaintiffs argue that Massachusetts duplicitously told its citizens that it was giving them cost-of-living increases and then turned around and illegitimately used those increases to cut off the food stamp program. They further charge that the words of §§ 8(a) and (e)—"specifically increased so as to include the bonus value of food stamps"—represent a requirement that the state demonstrate an intention specifically to replace the lost bonus value of food stamps by means of the increased cash benefit.

■ Simply as a matter of statutory language, plaintiffs' reading of the statute is, at least, awkward. We think the more likely reading of the phrase is, "increased by a specific amount". If Congress had wished to incorporate a specific intent test, it would have made more sense to say "increased specifically to replace". Instead, the provision reads, "specifically increased *so as to* include". [Emphasis supplied.] This language is more consistent with a test directed to the effect of the increase than to its purpose.

■ Moreover, § 8(c), beginning with "For the purposes of [§§ 8(a)(1) and (e)]", sets forth what appears to be a comprehensive definition of "specifically increased" rather than simply an added requirement. Under this subsection those states which had planned, prior to October 1, to raise their payment level in reliance on § 401, and which in fact made payments at that level in January large enough to invoke reimbursement, qualify as having specifically increased their benefits. By defining specific increase in terms of § 401, section 8(c) also makes it clear that the amount from which the increase was to be measured was the January, 1972, payment level. No intent requirement relating to replacement of food stamps exists in § 8(c), and it would be strange to define "specifically increased" so fully there while leaving to implication from § 8(a)(1) a further definitional requirement of such potential importance as the one plaintiffs suggest.[16]

---

15. The increases were mandated by former Mass.G.L. c. 118A § 1, providing for increases upon a 3% rise in the Consumer Price Index. They were implemented by the Department of Public Welfare in two letters. State Letter No. 315, dated August 9, 1973, provided for a cost-of-living increase due to a 3.4% rise from July, 1972, to March, 1973. State Letter No. 319, dated November 16, 1973, effectuated an increase based upon a rise of 4.1% from April through August, 1973. As a result of those increases, the relief provided an otherwise indigent individual, as of December, 1973, was:

| | |
|---|---|
| Old Age Assistance | $221.00 |
| Disability Assistance | $212.00 |
| Aid to the Blind | $242.50 |

16. There are several ways in which § 8(c) serves as a limiting definitional requirement. Besides restricting the time period, it also imposes added substantive requirements. First, the states must have planned to provide payments at the fully augmented figure under § 401(b)(1). Under this requirement, a state which had declared an augmented APL but only raised its payments by a portion of the extra would not be entitled to a *pro tanto* reimbursement, as it arguably would have been under the original legislation. (For example, if Massachusetts had carried forward its December, 1973, levels without the increases noted in the text following note 15, it might have been covered under § 401 alone, but clearly would not have been under § 8(c).) Second, the state must be spending enough to benefit actually from § 401. This would have excluded the case of a state increasing its APL (and its payments) even though its expenditures at the higher level did not exceed its 1972 costs. Such a case was unlikely, but might have occurred if a state had anticipated that the 1972 level would be exceeded in, say, 1975 (even though not in 1974), and had chosen to raise its levels immediately and absorb the cost in the interim.

Of conclusive importance to our interpretation is the timing—both of the statutes involved and of the states' reactions to those statutes. It should be remembered that the meaning given to "specifically increased" affects not only plaintiffs' food stamp eligibility under § 8(a)(1), but also Massachusetts' eligibility for "hold harmless" under § 8(e). Massachusetts undertook its actions in response to the original Social Security Amendments of 1972, P.L. 92–603, § 401. That law allowed augmented hold harmless simply if the state at its option effected an increase "by an amount which does not exceed the sum of (A) . . . and (B) the bonus value of food stamps in such State for January 1972." This language does not speak to any specific intent or designation. A state administrator or legislator, preparing to take advantage of this law, would have every right to assume that so long as the state increased its APL to the maximum APL, his state would qualify. In Massachusetts he would feel that the cost-of-living increases, topped off by whatever was needed to reach the bonus value, would be sufficient.

Not until the last days of December, 1973, with the enactment of P.L. 93–233, § 8, could an argument be made that the specific intent with which a state had acted or the designation accompanying its action was important. While the idea of requiring a specific intent test seems highly unorthodox to us in this kind of public welfare planning situation, we find bizarre the suggestion that Congress would have provided here for a retroactive specific intent or designation test.[17] No purpose for such a requirement suggests itself. The original goal of § 401 had been for the initial payment level under the new program to reflect at least the January, 1972, categorical grant level plus a cash equivalent to food stamps. It sufficed under § 401 that the money was provided—what the state called it did not matter to the 1972 Congress. There is no reason to believe that the 1973 Congress felt differently. Most states had not taken the bait and raised levels; recipients in those states were restored to food stamp eligibility. As to the five states which had fully cooperated with the Congressional plan, we can discern no reason why Congress would have wished to pull the rug out from under those which, fortuitously, had not designated the cash increase as a food stamp substitute. The greater likelihood is that Congress needed time to reflect upon how the programs should mesh and, recognizing that funds had already been allocated,[18] wished to preserve in the interim the status quo for those states which had taken advantage of § 401.[19]

Plaintiffs suggest that our view is contradicted by the actions of California and New York, states which they say satisfied a specific intent test. But the experience of these states seems to us to demonstrate precisely the opposite. From the facts revealed by *California Legislative Council for Older Americans v. Weinberger, supra,* California had increased its benefit level by $12 (more than its $10 food stamp bonus value) even before § 401 was passed, 375 F.Supp. at 229 note 27. No other increase being mentioned, it appears that the maximum APL for that state did not include an amount specifically intended to replace its recipients' loss of food stamps.[20] And in that case, it was

---

**17.** It will be remembered that under § 8(c), the state's action had to be taken prior to October 1, 1973.

**18.** H.Rep.No.93–627, 93d Cong. 1st Sess., 1973 U.S.Code Cong. & Admin.News at 3183–84.

**19.** The congressional history is sparse, but this view is supported by the remarks of the House Conference Chairman, Rep. Ullman, 119 Cong. Rec. H11956–57 (daily ed., Dec. 21, 1973).

**20.** None of the items listed in note 27 of that case indicate an intention specifically to replace lost food stamp bonus value; and the California legislation, passed too late under § 8(c) in any event, clearly speaks in objective monetary terms: "That the state exercises its option to increase the payment level under Section 401(b)(1) of Title IV of the Social Security Act Amendments of 1972 by an amount equal to the sum of (A) and (B) of Section

agreed that the content of "specifically increased" had been satisfied; only the timing under § 8(c) was contested.

While the New York legislation contained the phrase "in lieu of food stamp bonus value", N.Y. Social Services Law § 131–a(8) (McKinney's 1974), it is nonetheless equally clear that New York's actions were not taken with an intent specifically to replace food stamps. The increase there (to reflect the maximum APL) raised the benefits as to new recipients, but as to those who had been receiving assistance under the categorical programs in December, 1973, whose benefits were required to be maintained at their old level under P.L. 93–66 ("mandatories"),[21] the "cash out" was accompanied by no change in cash benefits. The New York three-judge court found:

> "Indeed, the only impact on plaintiffs of cashing out was negative: cashing out rendered plaintiffs food stamp ineligible. From the point of view of New York State, with respect to mandatories, the cash out provision allowed the state to credit each $10 previously paid by the state under Public Law 93–66, § 212 toward its hold harmless level. This result is clearly intended by the express terms of the challenged statute."

*Irizarry v. Weinberger,* 381 F.Supp. at 1153; *see also id.* at 1155. Thus in both New York and California, a pre-existing rise in benefits was carried over as a reimbursable food stamp "substitute"—precisely what plaintiffs here say Massachusetts may not do.

Underlying plaintiffs' argument is the charge that Massachusetts is "getting away with something"—short-changing plaintiffs or getting a free federal ride for benefits which other states have to pay for. We believe plaintiffs are wrong on this score as well. It would be sufficient answer that Massachusetts' categorical grant legislation (including the automatic cost-of-living increase provision) ended on December 31, 1973, and an entirely new statute, setting its own grant levels in dollar amounts, took effect to implement the new program the next day. The state was, therefore, under no legal obligation to its citizens to carry over the cost-of-living increase into the new year; it was perfectly free to cancel that increase if it wished. Moreover, accepting arguendo plaintiffs' concept that Massachusetts abrogated the cost-of-living increases of 1973 by converting them to food stamp replacement, such a cancellation was not to last long. The Massachusetts law (St.1973, c. 1210) setting January payment levels (§ 35) also provided for increases in those payment levels. First (§ 36), it mandated a ten percent increase as of March 1, 1974. Second (§ 23, codified at Mass.G.L. c. 118A, § 2), it provided its own cost-of-living adjustment. The 1973 payment level increases had been based on rises in the Consumer Price Index, primarily in 1973 (although some in 1972), *see* note 15 *supra*; the new cost-of-living section provided for annual adjustments beginning (on July 1, 1974) with the rise in the Consumer Price Index during all of 1973. Thus, as of July, 1974, Massachusetts SSI recipients would have the benefit of the $10 being reimbursed under § 401, the March, 1974, ten percent increase, and the July, 1974, increase due to the 1973 rise in the cost-of-living.[22]

Finally, we agree with the district court that the appropriate standard of review is whether the Secretary's finding was "arbitrary, capricious, an abuse of discretion, or otherwise not in

---

401(b)(1) of that title." 375 F.Supp. at 222, note 17.

21. *See* note 5, *supra*.

22. As we read the Massachusetts statute, this would mean a payment level considerably higher than the December, 1973, level plus $10. However, we are not informed as to whether these increases went into effect as provided by c. 1210, or (if they did), how much they actually turned out to be. The point is that, even accepting plaintiffs' perspective, Massachusetts planned independently of the $10 to carry over its cost-of-living provisions; any decision at a later time to abrogate them would not have been inconsistent with *Rosado v. Wyman, supra*.

accordance with law", 5 U.S.C. § 706; 388 F.Supp. at 389. Under this provision, even were we persuaded that the plaintiffs' interpretation of the statute is a reasonable one, we would feel constrained to affirm the Secretary's determination under the rule of deference to agency construction in close cases. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), stated:

> "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' *Unemployment Comm'n v. Aragon,* 329 U.S. 143, 153 [67 S.Ct. 245, 250, 91 L.Ed. 136]. See also *e. g. Gray v. Powell,* 314 U.S. 402 [62 S.Ct. 326, 86 L.Ed. 301]; *Universal Battery Co. v. United States,* 281 U.S. 580, 583 [50 S.Ct. 422, 74 L.Ed. 1051]. 'Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'" *Power Reactor Co. v. Electricians,* 367 U.S. 396, 408 [81 S.Ct. 1529, 1535, 6 L.Ed.2d 924]."

The continued viability of this language is shown by its citation, among other cases, in *Rosado v. Wyman,* 397 U.S. 397, 415, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), and more recently in *Shea v. Vialpando,* 416 U.S. 251, 262, note 11, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974).

We therefore turn to plaintiffs' constitutional arguments.

Plaintiffs' equal protection claim is premised on the view that under the Secretary's interpretation, § 8 creates two classes of SSI recipients: (1) those outside of Massachusetts, who receive either food stamp benefits or a specific cash substitute;[23] and (2) those in Massachusetts, who are allegedly denied both. It will be clear from the previous discussion that we do not accept the factual premise. The statutory scheme provides that SSI recipients receive either food stamps, or benefits at the January, 1972, level plus a cash equivalent to food stamps. In Massachusetts, as in the other "cash-out" states, they in fact receive the latter. (Indeed, in Massachusetts, as of July 1, 1974, they apparently received more than the December, 1973, level plus the food stamp equivalent.) It is not entirely irrelevant to add, since the point raises concepts of equality as among SSI recipients in different states, that Massachusetts has traditionally been liberal in its welfare benefits and that its present level of payments would be considerably higher than the average SSI level even were the cash equivalent to food stamps to be disregarded.

Plaintiffs lastly contend that the Secretary's interpretation of § 8 creates an impermissible irrebuttable presumption that if § 8(c) is satisfied, there was a specific intent on the state's part to replace food stamps by means of its increased payment level. This claim, like the equal protection claim, rests upon a premise which we have rejected—that § 8(a)(1) includes a specific intent requirement. Whatever the continued scope of the irrebuttable presumption doctrine, *see Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), it is inapplicable here because of the absence of any presumption of any nature.

*Affirmed.*

---

**23.** Plaintiffs explicitly disclaim any discrimination from the fact that fixing of the bonus value at $10 is the result of averaging and not a precise equivalent. *See* notes 7 & 9 *supra.*